[This opinion has been published in *Ohio Official Reports* at 74 Ohio St.3d 49.]

THE STATE OF OHIO, APPELLEE, *v.* GARNER, APPELLANT.

[Cite as *State v. Garner*, 1995-Ohio-168.]

*Criminal law—Aggravated murder—Death penalty upheld, when.*

(No. 94-1964—Submitted July 12, 1995—Decided November 22, 1995.)

APPEAL from the Court of Appeals for Hamilton County, No. C-920864.

————————

{¶ 1} In the pre-dawn hours of January 26, 1992, three fires were intentionally set in the apartment of Addie F. Mack at 1969 Knob Court in Cincinnati while Mack was being treated at a local hospital emergency room. As a result, five children who had been sleeping on the second floor of the apartment died of smoke inhalation. Mack's oldest child, Rod (age thirteen), survived by escaping through a window. He was found at the scene by police officers: crying, upset and shoeless on the bitterly cold January night.

{¶ 2} Later that morning, police interviewed Thomas J. Tolliver, a cab driver for the Yellow Cab Company. Investigators had been led to Tolliver based upon information provided by two police squad car officers who had observed a young man walking to a Yellow Cab waiting outside the 1969 Knob Court address just prior to the time the fire was reported.

{¶ 3} Tolliver provided police with an address on Burnet Avenue to which he had delivered his previous night's fare, who had identified himself as "William." Tolliver described picking "William" up at the same hospital emergency room where Mack had been treated, driving to 1969 Knob Court, and waiting while "William" entered the apartment and eventually brought several items to the cab. Tolliver told police he then drove his fare to a United Dairy Farmers ("UDF") convenience store and waited while "William" purchased several items. Police recovered a television set from Tolliver which "William" had removed from Knob Court, and which Tolliver

accepted as collateral in lieu of payment of cab fare when "William" told him he could not pay cash.

{¶ 4} Police obtained surveillance videotape from the UDF and showed Tolliver still photographs taken from it. Tolliver confirmed that the individual shown therein was his fare from the previous evening, although Tolliver made his identification on the basis of clothing rather than facial features. During this questioning, Tolliver was shown three photo arrays, two of which contained police photographs of appellant, William L. Garner. Tolliver identified Garner as the "William" he had transported the night before in both of the two photo arrays which included Garner's photograph.

{¶ 5} As a result of the information received from Tolliver, police obtained a search warrant and searched the Burnet Avenue residence where "William" had been taken by Tolliver. Police there recovered several items which matched descriptions Tolliver had given of items his passenger had brought to the cab from the Knob Court address. Police recovered a VCR, a Sony "boom box," and a portable telephone, as well as a pair of gloves, a set of keys later identified as Addie Mack's, and copies of her children's birth certificates. Police photographed a UDF grocery bag in a trash can at the residence. During the search police arrested Garner, in connection with the fire, and advised him of his *Miranda* rights.

{¶ 6} Garner was interviewed at police headquarters, where he provided a taped statement in which he described events of the previous night. He recounted having found Mack's purse near a pay telephone in the emergency room area of the hospital, and obtaining Mack's address, food stamps, and keys from the purse. He admitted calling a cab and being transported to the Knob Court address. Garner acknowledged that his intent in going to Mack's apartment was to "take her things." Garner described going through the rooms in the apartment, and noticing that a back bedroom was "full o[f] girls." He described talking to one girl who asked him for water, and providing it to her. Garner said the girl then turned on a television set for

a few minutes before going back to the room where the other girls were sleeping. Garner also admitted having been in the bedroom in which the two boys were sleeping.

**{¶ 7}** Garner admitted taking a television set, a VCR, a telephone, and a "radio box" from the apartment, and putting them in the cab. He described telling the driver that he and his girlfriend had a "fallin[g] out," forcing him to move his possessions. He admitted setting one fire at Mack's apartment by throwing a lighted match onto a couch on the first floor, and confirmed watching a small flame ignite in the couch. He then left the apartment with the final stolen item (the television) and directed the cab driver to make a stop at a UDF convenience store. Garner said he there purchased several items before instructing the driver to take him to his residence at 3250 Burnet Avenue.

**{¶ 8}** When asked why he had set the couch on fire, Garner stated that he had intended to create a smoke screen and to cover fingerprints he suspected he had left on the couch. He told police that he believed the children would smell the smoke and get out of the house, particularly as he believed one child to be awake, and that all of the children were old enough to get out.

**{¶ 9}** Rod Mack, the sole survivor of the fire, testified that he and his friend, Richard Gaines, were sleeping in one of the upstairs bedrooms on the night of the fire, and that all four girls were sleeping together in a second bedroom. Mack testified that the "radio" (Sony boom box) found by police at appellant's residence was his, and had been in his bedroom on the night of the fire. He testified that the receiver portion of a two-piece cordless phone (later recovered during the police search of Garner's residence) had been located in the bedroom where all of the girls had been sleeping. He testified that the VCR recovered from appellant's residence had been located in a third bedroom, his mother's room.

**{¶ 10}** Rod described being awakened by smoke, seeing fire in the hallway outside his bedroom, and hearing his sisters screaming in their room. Finding the

hallway blocked by fire, Rod told his friend Richard to follow him out a bedroom window. As Rod exited through the window, Richard instead opened the door to the hall. As Rod continued his escape, he heard Richard fall to the floor, where his body was ultimately found by firefighters.

{¶ 11} A smoke detector was found in the apartment after the fire, but did not contain a battery, and was thus inoperable.

{¶ 12} Following the fire, Cincinnati Fire Division investigator Peter Frye concluded that, in addition to an intentional fire having been set in the living room couch, two other fires were intentionally set in the apartment. One fire was set in a bed in the mother's unoccupied bedroom, and one in a bed in the remaining unoccupied fourth bedroom. The latter two fires had smoldered but eventually gone out. Frye testified that the fire originating in the couch almost totally destroyed the contents of the living room, and resulted in heavy smoke filling the entire apartment.

{¶ 13} Garner was indicted and charged with five counts of aggravated felony-murder (R.C. 2903.01[B]). Each count included three death penalty specifications. In addition, Garner was charged with aggravated burglary (R.C. 2911.11), and two counts of aggravated arson (R.C. 2909.02). A jury found Garner guilty of all charges, including the death penalty specifications. Thereafter the jury returned a recommendation that he be sentenced to death, and that recommendation was accepted by the trial court.

{¶ 14} The court of appeals affirmed Garner's convictions and death sentence, and the cause is now before this court upon an appeal as of right.

_____

*Joseph T. Deters*, Hamilton County Prosecuting Attorney, and *Christian J. Schaefer*, Assistant Prosecuting Attorney, for appellee.

*H. Fred Hoefle* and *Robert J. Ranz*, for appellant.

_____

**MOYER, C.J.**

{¶ 15} Appellant has raised twenty-three propositions of law. We have reviewed each and, for the reasons stated below, we find that none justifies reversal of appellant's conviction of the crimes of aggravated murder, aggravated burglary and aggravated arson. We have fulfilled our responsibilities to independently review the record, weigh the aggravating circumstances against the mitigating factors, and examine the proportionality of a sentence of death in this case. Upon full review of the record we affirm appellant's convictions and death sentence.

I

*Failure to Merge Specifications*

{¶ 16} The jury found Garner guilty of three statutory death penalty specifications as to each murder: engaging in a course of conduct on January 26, 1992 involving the killing of two or more persons (R.C. 2929.04[A][5]); committing the aggravated murders for the purpose of escaping detection, apprehension, trial or punishment for another offense (R.C. 2929.04[A][3]); and committing the aggravated murders, as a principal offender, while committing or fleeing immediately after committing aggravated burglary and aggravated arson (R.C. 2929.04[A][7]). Garner claims reversible error in the trial court's denial of his motion to merge the R.C. 2929.04(A)(3) and (A)(7) specifications, and to instruct the jury that they should be weighed as one aggravating circumstance in determining the appropriate sentence.

{¶ 17} The law governing our resolution of this contention is set forth in the fifth paragraph of the syllabus of *State v. Jenkins*[1] (1984), 15 Ohio St.3d 164, 15 OBR 311, 473 N.E.2d 264, which provides:

"In the penalty phase of a capital prosecution, where two or more aggravating circumstances arise from the same act or indivisible course of conduct and are thus

---

1. The law set forth in the fifth paragraph of *Jenkins* has consistently been followed by this court. See, *e.g.*, *State v. Spisak* (1988), 36 Ohio St.3d 80, 84, 521 N.E.2d 800, 803; *State v. Wiles* (1991), 59 Ohio St.3d 71, 84, 571 N.E.2d 97, 115.

duplicative, the duplicative aggravating circumstances will be merged for purposes of sentencing. Should this merging of aggravating circumstances take place upon appellate review of a death sentence, resentencing is not automatically required where the reviewing court independently determines that the remaining aggravating circumstances outweigh the mitigating factors beyond a reasonable doubt and that the jury's consideration of duplicative aggravating circumstances in the penalty-phase did not affect the verdict."

{¶ 18} We believe it is a necessary corollary to *Jenkins* that, where a jury in the guilt phase of a capital trial has found the defendant guilty of duplicative specifications, a trial court should instruct the jury in the penalty phase that those duplicative specifications must be considered merged for purposes of weighing the aggravating circumstances against the mitigating factors. In this case, no such instruction was given. Thus, pursuant to *Jenkins*, in order to determine whether that omission constituted reversible error, we must engage in a two-pronged analysis. We first look to see whether the specifications at issue "ar[o]se from the same act or indivisible course of conduct," and were thus, in fact, duplicative. If this initial inquiry is answered in the affirmative, *Jenkins* instructs us to proceed to determine whether the jury's penalty-phase consideration of those duplicative aggravating circumstances affected its verdict, and to independently determine whether the merged aggravating circumstances outweigh the mitigating factors beyond a reasonable doubt.

{¶ 19} The court of appeals correctly concluded that the specifications based on R.C. 2929.04 (3) and (7) arose from an indivisible course of conduct, *i.e.*, Garner's actions in burglarizing and setting fire to the residence at 1969 Knob Court. Having reviewed the record in detail, we reject the state's factual contention that Garner had completed the theft offense and then initiated a second, separate course of conduct in setting the fires. The record instead justifies the conclusion that Garner set the fires before exiting the apartment for the final time with the last stolen item, the television.

His actions in burglarizing the residence and attempting to cover up his conduct by setting the fires were inextricably intertwined, and thereby constituted one indivisible course of conduct. This conclusion obtains even though Garner may have had multiple motives in setting the fire, *i.e.*, he may have intended both to eliminate possible witnesses as well as to destroy fingerprints or other evidence of his presence. Similarly, the fact that the children did not actually die until some time after Garner left the premises does not require a finding that the specifications were non-duplicative, as the *cause* of the deaths, *i.e.*, the ignition of the fires, occurred in conjunction of time and place with the burglary and arson. We conclude that the defendant's motion to merge the specifications in this case for purposes of sentencing should have been granted, and the jury should have been instructed accordingly.

{¶ 20} Having satisfied the first prong of the *Jenkins* analysis, we next determine whether the jury's consideration of duplicative aggravating circumstances in the penalty phase affected its verdict. We find beyond a reasonable doubt that the trial court's failure to instruct the jury that the duplicative specifications should be considered merged did not influence the jury to recommend death whereas it would otherwise have recommended life.

{¶ 21} In coming to this conclusion we note that, where a verdict of guilt has been returned as to even a single R.C. 2929.04 (A) specification, a jury is required to consider a wide range of evidence, including evidence of the nature and circumstances of the crime, in determining whether the aggravating circumstances outweigh the mitigating factors. R.C. 2929.03(D)(1) and (2); *State v. Gumm* (1995), 73 Ohio St.3d 413, 653 N.E. 2d 253. That is, merger of the duplicative circumstances in this case would not have significantly changed the nature of the evidence the jury was statutorily required to consider in making its recommendation as to a possible sentence of death. In this case the jury was not expressly instructed that its finding of guilt of multiple specifications should be deemed to increase the weight it accorded the aggravating circumstances. Cf. *State v. Penix* (1987), 32 Ohio St.3d 369, 372, 513

N.E.2d 744, 747, discussing *Jenkins*. We do not believe that the weight of the aggravating circumstances was inflated as a result of the trial court's failure to instruct the jury that it was to consider the duplicative specifications merged.

{¶ 22} Application of the *Jenkins* test does not violate Garner's right under the Ohio Constitution to trial by jury. See *State v. Gumm, supra*, at 429-430, 653 N.E.2d at 268. Similarly, we affirm our consistent precedent that no constitutional violation occurs where errors found to have occurred in the penalty phase of a capital trial are deemed cured by the independent review of this court. *State v. Combs* (1991), 62 Ohio St.3d 278, 286, 581 N.E.2d 1071, 1079. See, also, *Clemons v. Mississippi* (1990), 494 U.S. 738, 745, 110 S.Ct. 1441, 1446, 108 L.Ed.2d 725, 736.

II

*Propriety of Instruction on Mental Disease*

*or Defect as Mitigation*

{¶ 23} In *State v. DePew* (1988), 38 Ohio St.3d 275, 528 N.E.2d 542, this court held that, pursuant to R.C. 2929.04(C), "it is the defendant who has the right to present and argue the mitigating factors. If he does not do so, no comment on any factors not raised by him is permissible." *Id*. at 289, 528 N.E.2d at 557. Similarly, the trial court should only instruct the jury on those mitigating factors raised by the defense. *State v. Hicks* (1989), 43 Ohio St.3d 72, 77, 538 N.E.2d 1030, 1036, at fn. 3. At issue in this case is whether the defense "raised" the mitigating factor set forth in R.C. 2929.04(B)(3) -- whether, as the result of a mental disease or defect, the offender lacked substantial capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law at the time he committed the offenses.

{¶ 24} At the beginning of the mitigation phase of the trial, defense counsel requested the court to include an instruction on the R.C. 2929.04(B)(3) mitigating factor. As part of its mitigation case the defense called Dr. Nancy Schmidtgoessling, a psychologist, and Dr. Jeffrey Smalldon, a clinical psychologist. Both psychologists testified at length about their assessments of Garner's intelligence, overall mental

condition and psychological health. Dr. Smalldon testified that, in his professional opinion, Garner suffered from relatively mild brain impairment, residual attention deficit disorder, probable marijuana abuse, borderline intellectual functioning, and mixed personality disorder with borderline antisocial features. On cross-examination Dr. Smalldon testified that Garner's mild organic dysfunction caused him to have problems in exercising good judgment and complex decision making, but further acknowledged that Garner had scored within a nonimpaired range on tests designed to measure problem-solving judgment, abstract reasoning, concept formation, mental flexibility and mental deficiency.

{¶ 25} After the psychologists had testified, the defense withdrew its request for jury instructions on the R.C. 2929.04(B)(3) mitigating factor, stating that "[w]e are not going to assert that particular mitigating circumstance." However, in first requesting the (B)(3) instruction, and calling expert witnesses to testify to the mental condition of the defendant, the defense had already "raised" the (B)(3) mitigating factor as that term was used in *DePew*. We will not sanction a procedure whereby the defense may effectively control the court's charge by representing that it is abandoning a particular mitigating factor based on an evaluation that the testimony of its mitigation witnesses was unfavorable. The defense indeed raised R.C. 2929.04(B)(3) as possible mitigation, and the trial court did not err in including that statutory mitigating factor in its instructions.

III

*Rejection of Proposed Instructions on*

*Residual Doubt and Mercy*

**{¶ 26}** The trial court overruled a defense motion to instruct the jury that "residual doubt or lingering doubts about the guilt of the defendant" could be considered a mitigating factor. Similarly, the trial court refused to give the following instruction proffered by the defense: "[W]hile your decision should not be based merely upon sympathy, you may extend mercy by returning a verdict for life imprisonment, where such a verdict is appropriate, considering the evidence presented in mitigation, and the mitigating factors which you find to exist." Garner asserts in this court that failure to use the proffered instructions constituted reversible error.

**{¶ 27}** Residual doubt of guilt has been defined as "a lingering uncertainty about facts, a state of mind that exists somewhere between `beyond a reasonable doubt' and `absolute certainty.'" *Franklin v. Lynaugh* (1988), 487 U.S. 164, 188, 108 S. Ct. 2320, 2335, 101 L.Ed. 2d 155, 175 (O'Connor, J., concurring). This court has previously recognized residual doubt to be a proper subject of jury consideration during the penalty phase of a capital case. *State v. Gillard* (1988), 40 Ohio St.3d 226, 234, 533 N.E.2d 272, 281; *State v. Grant* (1993), 67 Ohio St.3d 465, 481, 620 N.E.2d 50, 67-68. See, also, *State v. Watson* (1991), 61 Ohio St.3d 1, 17, 572 N.E.2d 97, 111. We note that this view is not uniformly shared. See, *e.g.*, *State v. Watson, supra* (Resnick, J., concurring); *Franklin v. Lynaugh, supra* (O'Connor, J., concurring).

**{¶ 28}** The overwhelming weight of authority, even in jurisdictions that recognize a capital defendant's right to argue residual doubt, is that a defendant is not entitled to an *instruction* on residual doubt. See, *e.g.*, *Smith v. Black* (C.A. 5, 1990), 904 F.2d 950, 968; *Franklin v. Lynaugh, supra*, at 173-174, 108 S.Ct. at 2326-2328, 101 L.Ed.2d at 155, 165-166. Cf. *Lockhart v. McCree* (1986), 476 U.S. 162, 181, 106 S.Ct. 1758, 1769, 90 L.Ed.2d 137, 153; *Carroll v. State* (Ala. Crim. App. 1992), 599 So.2d 1253, 1271; *People v. Johnson* (1992), 3 Cal.4th 1183, 1252, 14 Cal.Rptr.2d

702, 741, 842 P.2d 1, 40. We agree with this authority. Garner was not entitled to an instruction identifying residual doubt as a mitigating factor.[2]

{¶ 29} Similarly, precedent from this court precludes Garner's argument that he was entitled to an instruction that the jury could lawfully extend mercy in returning its sentencing verdict. In *State v. Lorraine* (1993), 66 Ohio St.3d 414, 613 N.E.2d 212, we held that a capital defendant is not entitled to an instruction that mercy may be deemed a mitigating factor. In this case the trial judge adequately instructed the jury that it might consider the mitigating factors to be those circumstances which "in fairness and mercy may be considered as extenuating or reducing the degree of moral culpability." Such a charge constitutes adequate instruction concerning the extension of mercy to a capital defendant. *State v. Grant,* 67 Ohio St.3d at 481, 620 N.E.2d at 67, citing *State v. Jenkins, supra.*

{¶ 30} The trial court did not err in rejecting the defendant's proffered instructions on residual doubt and mercy.

IV

*Alleged Ex Post Facto Application of*
*New Judicial Doctrine*

{¶ 31} Garner argues that, prior to the 1993 case of *State v. Lorraine, supra,* Ohio law recognized mercy as a mitigating factor, citing *State v. Rogers* (1986), 28 Ohio St.3d 427, 434, 28 OBR 480, 486, 504 N.E.2d 52, 58, and *State v. Zuern* (1987), 32 Ohio St.3d 56, 63-64, 512 N.E.2d 585, 593. Garner contends that *Lorraine* constituted a judicial change in this law which cannot, consistent with due process, be applied against him, as his trial occurred prior to the *Lorraine* decision. The argument is not well taken.

---

2. Although the trial court rejected Garner's proposed residual doubt instruction, it advised defense counsel that it would allow a residual doubt argument in the defense summation, and such an argument was in fact made to the jury.

{¶ 32} The United States Supreme Court has acknowledged that "[a]n unforeseeable judicial enlargement of a criminal statute, applied retroactively, operates precisely like an ex post facto law * * *," *Bouie v. Columbia* (1964), 378 U.S. 347, 353, 84 S. Ct. 1697, 1702 12 L. Ed. 2d 894, 899, and can thereby violate the Due Process Clause of the Fourteenth Amendment to the United States Constitution. This is so even though the constitutional prohibition against ex post facto laws is applicable only to legislative enactments. *Marks v. United States* (1977), 430 U.S. 188, 191-192, 97 S.Ct. 990, 992-993, 51 L. Ed. 2d 260, 265. Accord *State v. Webb* (1994), 70 Ohio St.3d 325, 638 N.E.2d 1023.

{¶ 33} We reject Garner's contention, however, that *Rogers* and *Zuern* stand for the proposition that, prior to *Lorraine,* mercy was a recognized mitigating factor in Ohio. In *Rogers*, the court simply noted that "[defense counsel] certainly has the right to plead for mercy." *Rogers,* 28 Ohio St.3d at 434, 28 OBR at 486, 504 N.E.2d at 58. This dictum does not constitute recognition of mercy as a mitigating factor. Nor did *Zuern* recognize mercy as a mitigating factor, but rather merely recognized that an Ohio jury "is not precluded from extending mercy to a defendant." *Zuern*, 32 Ohio St.3d at 63-64, 512 N.E.2d at 592-593. Accord *State v. Mills* (1992), 62 Ohio St.3d 357, 372, 582 N.E.2d 972, 986. In *Lorraine* we rejected the contention that a capital defendant was entitled to a jury instruction concerning mercy. There being no judicial precedent prior to *Lorraine* recognizing a right to an instruction on either mercy or residual doubt, no change of law by judicial construction occurred, and no cause exists for engaging in an ex-post-facto analysis as to these issues.

{¶ 34} Consistent with the jury instructions, defense counsel asked the jury during his summation to consider the mitigating quality of the evidence in a spirit of "fairness and mercy," and indeed, defense counsel invoked the jury "to open your hearts for mercy." No objection was interposed to these arguments. Because Garner was permitted to plead for mercy, he has no standing to assert, and we have no cause

to determine, the claim that *Lorraine* changed prior law to preclude defense counsel in a capital case from *arguing* for mercy.

## V

### *Prosecutorial Misconduct*

{¶ 35} Garner contends that the prosecutors' final argument to the jury at the conclusion of the penalty phase constituted prosecutorial misconduct so egregious as to warrant reversal of the death sentence. We disagree.

{¶ 36} Garner objects to what he contends was impermissible argument of nonstatutory aggravating circumstances. His position is foreclosed by our recognition in *State v. Gumm, supra*, that prosecutorial argument based on the nature and circumstances of the crime as disclosed by the evidence is permissible. For example, the prosecutor could legitimately refer to the screams of the girls who died in the fire, as that fact was testified to by the only survivor of the fire, Rod Mack.

{¶ 37} We have examined the record of both the prosecutors' conduct during voir dire and in closing arguments and we do not find that the prosecutors who tried this case argued facts not in evidence, misstated the law, or engaged in inflammatory rhetoric so as to justify the conclusion that Garner was prejudicially deprived of a fair trial. Cf. *State v. Lott* (1990), 51 Ohio St.3d 160, 166, 555 N.E.2d 293, 300; *State v. Fox* (1994), 69 Ohio St.3d 183, 189, 631 N.E.2d 124, 129.

## VI

### *Alleged Prejudicial Reference to Arrest Record of Defendant*

{¶ 38} Garner became a suspect in this case as a result of Tolliver's having informed police that he had delivered his fare to 3250 Burnet Avenue on the night of the fire. A police investigator testified that, when given this information, he sought further information as to the occupants of that residence, and "ran the phone number that was at the residence at 3250 Burnett [*sic*] Avenue and it came back William Garner *using that address in one of his arrests*." (Emphasis added.) Defense counsel immediately objected to this reference to Garner's prior police record, and moved for

a mistrial. The court refused to grant a mistrial, but sustained the defense objection in the presence of the jury, and expressly instructed the jury to disregard the officer's statement.

{¶ 39} The grant or denial of an order of mistrial lies within the sound discretion of the trial court. *State v. Glover* (1988), 35 Ohio St.3d 18, 517 N.E.2d 900; *State v. Widner* (1981), 68 Ohio St.2d 188, 190, 22 O.O.3d 430, 431, 429 N.E.2d 1065, 1066-1067. A jury is presumed to follow the instructions, including curative instructions, given it by a trial judge. See *State v. Loza* (1994), 71 Ohio St.3d 61, 75, 641 N.E 1082, 1100, quoting *State v. Henderson* (1988), 39 Ohio St.3d 24, 33, 528 N.E.2d 1237, 1246. Moreover, mistrials need be declared only when the ends of justice so require and a fair trial is no longer possible. *State v. Franklin* (1991), 62 Ohio St.3d 118, 127, 580 N.E.2d 1, 9. In this case, the reference to the defendant's prior arrests was fleeting and was promptly followed by a curative instruction. The trial court did not abuse its discretion in failing to order a mistrial. Cf. *State v. Glenn* (1986), 28 Ohio St.3d 451, 455, 504 N.E.2d 701, 706; see *State v. Warren* (1990), 67 Ohio App.3d 789, 799, 588 N.E.2d 905, 912.

## VII

### *Sufficiency of Evidence of Intent to Kill*

{¶ 40} R.C. 2903.01 provides that guilt of aggravated murder is dependent upon establishment of a "specific intent of the [defendant] to have caused the death [of another] by proof beyond a reasonable doubt." At trial, Garner did not dispute that he was responsible for causing the fire at Mack's apartment. Garner's defense to the aggravated murder charge centered on his claim that he lacked the requisite *mens rea* element of intent to kill. The defense asserted, on the basis of Garner's taped confession, that he did not believe that the children would be killed but rather that he thought that they would awaken and escape. Garner argued that he should be found guilty only of the lesser-included offense of involuntary manslaughter, rather than aggravated murder.

**{¶ 41}** The law has long recognized that intent, lying as it does within the privacy of a person's own thoughts, is not susceptible to objective proof. The law recognizes that intent can be determined from the surrounding facts and circumstances, and persons are presumed to have intended the natural, reasonable and probable consequences of their voluntary acts. *State v. Carter* (1995), 72 Ohio St.3d 545, 554, 651 N.E.2d 965, 974; *State v. Johnson* (1978), 56 Ohio St.2d 35, 39, 10 O.O. 3d 78, 80, 381 N.E.2d 637, 640; *State v. Thomas* (1988), 40 Ohio St.3d 213, 217, 533 N.E.2d 286, 290. Intent """can never be proved by the direct testimony of a third person and it need not be. It must be gathered from the surrounding facts and circumstances * * *.""" *State v. Lott*, 51 Ohio St.3d at 168, 555 N.E.2d at 302, quoting *State v. Huffman* (1936), 131 Ohio St. 27, 5 O.O. 325, 1 N.E.2d 313, paragraph four of the syllabus. Similarly while guilt of aggravated murder requires proof of specific intent to kill, R.C. 2903.01 contemplates that such an intent may be inferred in a felony-murder when the offense and the manner of its commission would be likely to produce death.

**{¶ 42}** Appellant argues to this court that the evidence demonstrated no more than a thoughtless act by a nineteen-year-old who did not think about the potential consequences of his reckless acts. While this argument constitutes a plausible interpretation of the evidence, it was the jury's responsibility to determine Garner's intent as a matter of fact, and the jury rejected the defense interpretation of the evidence. When a defendant challenges the sufficiency of the evidence, "[t]he relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *State v. Jenks* (1991), 61 Ohio St.3d 259, 574 N.E.2d 492, paragraph two of the syllabus; *State v. Campbell* (1994), 69 Ohio St.3d 38, 46, 630 N.E.2d 339, 348. We will not second-guess the jury's finding. We unhesitatingly find that the natural, reasonable and probable consequence of Garner's having set three separate fires in an apartment occupied by six children age thirteen

and under is that those children would die. There was thus sufficient evidence to support the jury's finding that Garner possessed the requisite mental elements of the crime of aggravated murder.

## VIII

### *Miranda Issues*

**{¶ 43}** Law enforcement officers were not required to inform Garner that he was potentially eligible for a death sentence prior to obtaining a valid waiver of the right to counsel. *State v. Bell* (1976), 48 Ohio St.2d 270, 278, 2 O.O.3d 427, 431, 358 N.E.2d 556, 562; *State v. Campbell, supra*, at 46, 630 N.E.2d at 348. See, also, *Colorado v. Spring* (1987), 479 U.S. 564, 577, 107 S. Ct. 851, 859, 93 L.Ed.2d 954, 968 (validity of waiver is not dependent upon the suspect being aware of the gravity of the offenses of which he is suspected).

**{¶ 44}** Police acknowledged a time discrepancy on the *Miranda* rights form signed by the defendant. Garner signed and dated the form citing the time of his waiver as 1:47 p.m. The advice-of-rights form, however, indicates the time of the waiver to be "1445 HRS" (2:45 p.m.). Appellant contends that this discrepancy raises the question whether he was interviewed prior to having validly waived his Sixth Amendment right to counsel.

**{¶ 45}** We do not find this contention to be well founded. First, we note that appellant provided no rebuttal to the testimony of the interrogating police officer who made the "1445 HRS" notation that his mistaken use of military time on the form caused the discrepancy. Further, other officers testified that appellant was advised of his rights prior to giving the taped statement not only at the police station, but prior thereto at the time of his arrest. Moreover, the audiotape of appellant's confession contains appellant's acknowledgment that he had previously executed the *Miranda* waiver form.

**{¶ 46}** Based upon the evidence presented, we hold that the trial court was justified in finding that appellant was adequately advised of his rights prior to making his statement.

IX

*Overly Suggestive Identification*

**{¶ 47}** Garner challenges the admissibility of cab driver Tolliver's in-court identification of him as the "William" the cabdriver described transporting on the night of the fire. Garner asserts that Tolliver's identification was based upon his exposure to overly suggestive photographic lineups in that (1) his photograph was the only one to appear in both of two separate arrays shown to the driver, and (2) only Garner's photograph was of a man 5"8" tall consistent with Tolliver's description of "William" as being 5'8" in height.

**{¶ 48}** Identifications made subsequent to an impermissibly suggestive procedure are admissible where the identification itself is nevertheless deemed reliable. "The central question is whether under the totality of the circumstances the identification is reliable even though the confrontation procedure was suggestive." *State v. Parker* (1990), 53 Ohio St.3d 82, 87, 558 N.E.2d 1164, 1169, citing *Manson v. Brathwaite* (1976), 432 U.S. 98, 114, 97 S.Ct. 2243, 2253, 53 L.Ed.2d 140,154, and *Neil v. Biggers* (1972), 409 U.S. 188, 199, 93 S.Ct. 375, 382, 34 L.Ed.2d 401, 411.

**{¶ 49}** In this case the evidence overwhelmingly supports the conclusion that Tolliver's identification of William Garner as his fare was reliable. Significantly, Tolliver refused to identify "William" in the first array of photographs he was shown, which did not include a photograph of Garner. However, when shown the UDF surveillance videotape shortly thereafter, Tolliver immediately identified the individual shown therein as "William" based on match of clothing. Because Tolliver was unable to discern the facial features of "William" on the videotape, however, exposure to that videotape could not have predisposed Tolliver towards subsequently identifying a picture of Garner's face. Similarly, because Tolliver identified Garner

immediately upon being presented with the first array which included Garner's picture, the fact that Garner's picture appeared later in a second array could not have had a suggestive effect on Tolliver's initial photographic identification. Moreover, while only Garner was shown in the police photos as being 5'8", several of the other photos displayed men of heights falling within inches of 5'8", and Tolliver testified that his identification of Garner "wasn't because of his height in the background," but because "[t]his is the man that was in my cab."

{¶ 50} Tolliver had contact with Garner for an extended period from the time he picked him up at the hospital at 4:45 a.m. until the time Garner was finally dropped off on Burnet Ave., approximately an hour later. Tolliver repeatedly testified that he watched "William's" actions closely, in part because he was concerned he was not going to be paid

{¶ 51} Based on the totality of these circumstances the trial court properly deemed Tolliver's identification of Garner to be reliable and did not err in refusing to suppress it.

X

*Alleged Unreliability of Informant Tolliver*

{¶ 52} Garner asserts that the search warrant authorizing search of Garner's residence was illegally obtained, having been issued based on information provided by an unreliable informant, Tolliver. Garner claims that the evidence obtained during the search should thus have been excluded.

{¶ 53} In reviewing this contention, we look to the totality of the circumstances to determine whether Tolliver's information provided the municipal judge with a substantial basis for concluding that probable cause existed that contraband or evidence of a crime would be found at Garner's residence. *State v. George* (1989), 45 Ohio St.3d 325, 544 N.E.2d 640, at paragraph one of the syllabus, and citing *Illinois v. Gates* (1983), 462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527. As

a reviewing court we accord great deference to the judge's determination of the existence of probable cause. *George, supra*, at paragraph two of the syllabus.

{¶ 54} In this case Tolliver was neither a confidential nor anonymous informant repeating hearsay information to police in the form of a "tip." He was rather a direct, citizen eyewitness to the activities of William Garner at the scene of a crime. Information coming from a citizen eyewitness is presumed credible and reliable, and supplies a basis for a finding of probable cause in compliance with *Gates*. Accord *People v. Hall* (1987), 164 Ill.App.3d 770, 776, 518 N.E.2d 275, 280; *Winters v. State* (Tex. App.1995), 897 S.W.2d 938. Such individuals do not expect any gain or concession in exchange for the information they give to the police, and are less likely to produce false or untrustworthy information. See *Jaben v. United States* (1965), 381 U.S. 214, 85 S. Ct. 1365, 14 L. Ed. 2d 345; *People v. Hall, supra*. Moreover Tolliver did not initiate contact with police, but rather was identified as a potential witness by the police who sought him out for questioning as a consequence of its independent criminal investigation. Cf. *State v. Rodriguez* (1992), 223 Conn. 127, 141, 613 A.2d 211, 218-219. We would create an undue burden on the issuance of search warrants were we to impose a requirement that police provide evidence of past instances of reliability of citizen eyewitnesses such as Tolliver, who generally provide information to police only once. See, generally, 1 LaFave, Search and Seizure (2 Ed. 1987), Section 3.4(a). We refuse to impose such a requirement.

{¶ 55} Review of the totality of the circumstances results in the clear conclusion that the judge acted lawfully in issuing the search warrant at issue in this case.

XI

*Voir Dire Issues*

{¶ 56} Garner asserts that at least four prospective jurors who were philosophically opposed to capital punishment were improperly excused from the venire based on the doctrine of *Witherspoon v. Illinois* (1968), 391 U.S. 510, 88 S.Ct.

1770, 20 L.Ed.2d 776, and in contravention of R.C. 2945.25(C). We follow our existing precedent in rejecting his argument. See *State v. Rogers, supra; State v. Beuke* (1988), 38 Ohio St.3d 29, 38, 526 N.E.2d 274, 284.

{¶ 57} All of the four prospective jurors referenced by appellant indicated in substance that they could not sign a verdict form recommending a death sentence and would be unable to follow the instructions of the court if those instructions required the signing of such a form. The judge appropriately recognized that the views of each prospective juror would ""prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.""" *State v. Beuke, supra*, at 38, 526 N.E.2d at 284, citing *Wainwright v. Witt* (1985), 469 U.S. 412, 105 S.Ct. 844, 83 L.Ed.2d 841. The trial court did not err in excusing these prospective jurors for cause.

{¶ 58} We further reject Garner's suggestion that due process required his being provided more than six peremptory challenges. We instead affirm our existing precedent to the contrary. See, *e.g.*, *State v. Greer* (1988), 39 Ohio St.3d 236, 245-246, 530 N.E.2d 382, 395-396; *State v. Carter, supra*.

{¶ 59} In addition, Garner was not denied the opportunity to intelligently exercise his peremptory challenges, nor impermissibly limited in his voir-dire questioning of prospective jurors. The trial court refused to allow counsel to ask prospective jurors whether they would "consider the youth of Mr. Garner if you had to go to that second [sentencing recommendation] phase as far as mitigating factor," based on the form of that question. However, the court allowed prospective jurors to be questioned as to whether they would follow instructions the court might later give them, including an instruction that youth should be considered as a mitigating factor. The ruling complied with Ohio law. See *State v. Bedford* (1988), 39 Ohio St.3d 122, 128-129, 529 N.E.2d 913, 920; *State v. Landrum* (1990), 53 Ohio St.3d 107, 118, 559 N.E.2d 710, 723-724.

{¶ 60} Similarly, the United States Supreme Court has recognized that a trial judge is afforded considerable discretion in conducting voir dire. *Mu'Min v. Virginia* (1991), 500 U.S. 415, 423, 111 S. Ct. 1899, 1904, 114 L. Ed. 2d 493, 505. While a capital defendant must be allowed to identify prospective jurors who have "predetermined the terminating issue of his trial, that being whether to impose the death penalty," *Morgan v. Illinois* (1992), 504 U.S. 719, 736, 112 S. Ct. 2222, 2233, 119 L.Ed.2d 492, 507, Garner was not precluded from asking prospective jurors whether they would impose a death sentence based solely upon a finding of aggravated murder, and irrespective of the facts and circumstances or the instructions of the court. This case is thus clearly distinguishable from *Morgan*. Cf. *United States v. Chandler* (C.A. 11, 1993), 996 F.2d 1073, 1103; *State v. Miller* (1995), 339 N.C. 663, 681, 455 S.E.2d 137, 146-147; *Plantz v. State* (Okla.Crim. App. 1994), 876 P.2d 268, 278.

{¶ 61} The trial court's rulings during voir dire comported with the requirements of the United States Constitution as well as with Ohio law.

## XII

### *Cumulative Error*

{¶ 62} In *State v. DeMarco* (1987), 31 Ohio St.3d 191, 31 OBR 390, 509 N.E.2d 1256, paragraph two of the syllabus, we recognized the doctrine of cumulative error. Pursuant to this doctrine, a conviction will be reversed where the cumulative effect of errors in a trial deprives a defendant of the constitutional right to a fair trial even though each of numerous instances of trial court error does not individually constitute cause for reversal. The doctrine is not applicable to the case at bar as we do not find multiple instances of harmless error. Cf. *State v. Webb*, 70 Ohio St.3d at 335, 638 N.E.2d at 1033; *State v. Davis* (1992), 62 Ohio St.3d 326, 348, 581 N.E.2d 1362, 1380.

XIII

*Alleged Insufficiency of Trial Court Sentencing Opinion*

**{¶ 63}** Assuming, *arguendo*, that the trial court's sentencing opinion was deficient in any way, errors in the opinion are cured by this court's independent review. *State v. Fox* (1994), 69 Ohio St.3d 183, 191-192, 631 N.E.2d 124, 131.

XIV

*Alleged Unconstitutionality of Ohio Death Penalty Statutes*

**{¶ 64}** Garner challenges the constitutionality of Ohio's death-penalty statutory framework for the express purpose of preserving the issue for federal review. "'*** [W]e have consistently held that Ohio's death penalty scheme is constitutional and we continue to adhere to that position.'" *State v. Carter*, 72 Ohio St.3d at 560, 651 N.E.2d at 979, citing *State v. Woodard* (1993), 68 Ohio St.3d 70, 79, 623 N.E.2d 75, 82, and numerous other cases.

XV

*Independent Review*

**{¶ 65}** The defense offered evidence that Garner possessed lower than average intelligence and was raised in a deplorable home environment, devoid of love, support, consistency and stability. Evidence existed from which the jury could conclude that Garner suffered sexual abuse as a child by an older brother, and physical abuse from his mother and others. The defense offered considerable mitigating evidence which is entitled to significant weight.[3] However, production of substantial mitigation evidence does not preclude a finding that the aggravating circumstances nevertheless outweigh the mitigating factors beyond a reasonable doubt. The tragic case of William Garner exemplifies this principle.

---

3. In his dissent, *infra*, Justice Wright has extensively outlined the nature of the mitigation evidence presented by the defense.

{¶ 66} In addition to Garner's age (nineteen at the time of the crime) and appalling childhood history, he asks us to consider residual doubt of his guilt as part of our independent review. The state produced abundant proof that Garner was responsible for causing the fire that took the lives of five children. While there is virtually no residual doubt on the question of Garner's identity as the perpetrator of this crime, Garner nevertheless contends that this court should accord significant weight to residual doubt that Garner *intended* to kill the children.

{¶ 67} As discussed, *supra*, ascertainment of a person's intent is not often objectively proven, but is reliant upon proof of the nature and circumstances surrounding an act, combined with determination of the natural, reasonable and probable consequences of that act. Ultimately in such a case, resolution of questions of intent is highly dependent upon the evaluation of the evidence by the factfinder at trial. Although this court is statutorily mandated to independently review the record to determine whether the aggravating circumstances outweigh the mitigating factors beyond a reasonable doubt, we are not required to redetermine *de novo* questions of fact previously determined by a jury. Rather, we are required to determine "if the evidence *supports* the finding" of guilt by the jury. R.C. 2929.05. Even assuming there is some modicum of residual doubt on the question of whether Garner intended to kill the children, we do not accord it significant weight in this case.

{¶ 68} In each capital case we are statutorily mandated to posit aggravating circumstances against mitigating factors. In so doing, we are required to "independently weigh all of the facts and other evidence disclosed in the record and consider both the offense and the offender" to determine whether a sentence of death is appropriate. R.C. 2929.05. In this case the jury found that Garner intentionally set fires in an apartment occupied by six young children, all but one of whom he knew to be sleeping. Garner set three fires, in three separate locations, and had been wearing gloves up until the time he set fire to the couch. The setting of those fires, wholly unnecessary even from the perspective of a burglar concerned about apprehension,

resulted in the deaths of five of those children, undoubtedly shattering the lives of three separate families.  When Garner drove away from the Mack apartment, he not only took with him the telephone from the girls' room, thereby depriving  them of a means of summoning help, but he also took with him the futures of five children, and left them to die trapped in an apartment filled with smoke.  His acts were callous, heinous, and completely unjustifiable.

{¶ 69} We note as well that the state produced evidence which tended to diminish the weight to be given the mitigation evidence.  For example, court-appointed psychologist Dr. Nancy Schmidtgoessling testified that Garner appeared healthy, neatly groomed, very coherent, organized, cooperative, emotionally calm, realistic in his thoughts, and of near average intelligence, even though she suspected possible organic brain impairment.  She saw no signs of a major mental illness and deemed him fully competent to stand trial.  Appellant was fully capable of scheming the burglary of Mack's apartment, and was able to concoct a plausible explanation for the cab driver's benefit as to why he was removing property from an apartment in the middle of the night.  Dr. Schmidtgoessling opined that defendant's diagnosed failure to thrive as an infant, referenced in Justice Wright's dissent, infra, did not affect or delay his early development beyond the first few months of life.  Several of the reprehensible events which occurred in Garner's family occurred before Garner was even born, e.g., the injury to the feet of Garner's brother, Marvin, and the murder of Garner's sister, Bobbie Lynette.

{¶ 70} The weighing of aggravating circumstances against mitigating factors in review of capital cases necessarily proceeds on a case-by-case basis. Having reviewed the entire record, we find beyond a reasonable doubt that the balance of aggravating circumstances against mitigating factors in this case weighs in favor of a death sentence.

XVI

*Proportionality Review*

{¶ 71} Pursuant to R.C. 2929.05(A), we are called upon to determine whether imposition of a death sentence in this case is both appropriate and proportional to other Ohio death penalty cases. We find that this court has consistently upheld the imposition of death stemming from murder in the commission of aggravated arson in cases whose facts are no more heinous or egregious in nature than are the facts of the case at bar. See, *e.g.*, *State v. Grant* (1993), 67 Ohio St.3d 465, 486, 620 N.E.2d 50, 72. ("That Rosalie Grant committed arson in order to murder her two infant sons outweighs the mitigating factors of Grant's troubled childhood, young age, lack of criminal record, and the existence of residual doubt. Thus, the death penalty is appropriate."); *State v. Richey* (1992), 64 Ohio St.3d 353, 595 N.E.2d 915; *State v. DePew, supra.* In addition, we have affirmed death sentences in cases where multiple victims have been murdered. *State v. Lorraine, supra; State v. Frazier* (1991), 61 Ohio St.3d 247, 574 N.E.2d 483; *State v. Coleman* (1989), 45 Ohio St.3d 298, 544 N.E.2d 622; *State v. Brooks* (1986), 25 Ohio St.3d 144, 25 OBR 190, 495 N.E.2d 407; and cases where the aggravated murder was committed in the course of an aggravated burglary, *e.g.*, *State v. Wiles* (1991), 59 Ohio St.3d 71, 571 N.E.2d 97; *State v. Holloway* (1988), 38 Ohio St.3d 239, 527 N.E.2d 831. Imposition of a death sentence upon William Garner is consistent with the proportionality analysis we are statutorily required to undertake.

{¶ 72} Accordingly, appellant's convictions and sentences are affirmed.

*Judgment affirmed.*

DOUGLAS, RESNICK, F.E. SWEENEY, PFEIFER and COOK, JJ., concur.

WRIGHT, J., dissents.

_____

**WRIGHT, J., dissenting.**

{¶ 73} As I have said on other occasions, I have no moral compunctions about imposing the death penalty when required. However, I believe that the death penalty should be applied only when the state has met its heavy burden of proof and should be used sparingly. That view is supported by the legislative history of R.C. 2929.04.

{¶ 74} As part of this court's review, we must independently determine whether the state has met its burden in proving that the aggravating circumstances outweigh the mitigating factors beyond a reasonable doubt. This, of course, is the heaviest burden under the law. In my view, the aggravating circumstances clearly do not outweigh the mitigating factors in this matter. This is the type of case that calls for the application of mercy, and it is for this reason that I respectfully dissent.

{¶ 75} I certainly cannot deny that this was a horrible crime, resulting in the senseless death of five innocent children. It is not my job to criticize a jury verdict supported by adequate evidence. I do not excuse Garner's actions, and I do believe that he should be severely punished for his crimes, *i.e.,* five life sentences. However, although the state has proven William Garner's guilt beyond a reasonable doubt, I believe that there is a fair amount of residual doubt as to whether Garner possessed the necessary purpose to kill.

{¶ 76} The mitigating factors that Garner presented are among the most compelling that this court has seen. The conditions in which Garner was raised and the experiences that he endured throughout his entire life are even more extreme than the factors presented in *State v. Murphy* (1992), 65 Ohio St.3d 554, 605 N.E.2d 884 (Moyer, C.J., Wright and Herbert R. Brown, JJ., dissenting).

{¶ 77} Garner's home life was one in which the "family structure" was replaced with violence, physical injury, sexual abuse and abject terror. The basic needs of Garner and his siblings were ignored by their mother, a child-care provider

26

of all things. His mother's need to satisfy her own immediate gratification superseded the needs of, and her responsibility to, her children.

{¶ 78} William Garner is the youngest of six children born to Patricia Garner. Mrs. Garner's other children are Gary Sawyer, Lisa Ross, Marvin Garner, Bobbie Lynette (now deceased), and William Garner's twin brother, Willie. Gary Sawyer is now incarcerated at the Southern Ohio Correctional Facility at Lucasville. While Mrs. Garner was pregnant with William and Willie, Bobbie was murdered by one of Mrs. Garner's boyfriends. Lisa was sexually abused over a period of years by one of Mrs. Garner's boyfriends. One instance of abuse was committed in the presence of Mrs. Garner, who did nothing to prevent it. Lisa's brother, Gary, also sexually assaulted her. Lisa testified that Gary also assaulted or attempted to assault two female cousins. Mrs. Garner testified that Gary admitted to her that he also sexually abused his brother, William, when they were children. Another one of Mrs. Garner's boyfriends submerged Marvin's feet into scalding water, causing severe burns that have left Marvin Garner disfigured to this day. This, of course, has resulted in a constant reminder to the entire family of the abuse that was a common occurrence in their house.

{¶ 79} Although the state has argued that the instances of abuse suffered by Lisa and the other Garner children are irrelevant as mitigating factors for appellant, the recitation of events that occurred throughout Garner's lifetime adds credence to the descriptions above and below of his tragic upbringing.

{¶ 80} Additionally, Garner was present in the household during the physical and sexual abuse of Lisa and the physical abuse suffered by the other children. This was the lifestyle in which he was reared. A constant pattern of physical, mental, emotional and sexual abuse and neglect is all that Garner has ever known.

{¶ 81} Lisa testified that she was responsible for the children when her mother was not at home. By age four, the twins, William and Willie, would go to

the grocery store to "hustle for money" for food. Lisa said the children would go to the neighborhood grocery store and offer to carry bags of groceries in exchange for food. On occasion, Mrs. Garner would take the money the children earned for food and would "go out with it."

{¶ 82} Lisa testified that their mother was abusive and violent towards the children as well as to her boyfriends and husbands. The children were beaten with anything she could get her hands on, such as two by fours and extension cords. Mrs. Garner had her children assist her in beating up her boyfriends, and the children were present when she and a boyfriend beat up her husband. Garner participated in one such beating when he was four or five years old.

{¶ 83} Dr. Nancy Schmidtgoessling, a psychologist appointed by the court to evaluate Garner, agreed that it is very difficult for a person like William Garner who is "raised in an environment where you have a mother who does not provide proper care and support for children, a brother who rapes you and beats you up, a home life where people are violated in numerous ways, a home life where no one cares as far as your educational background is concerned, where you find that situation, and you have a person who has a low IQ and some brain impairment to act in a pro social way."

{¶ 84} Dr. Schmidtgoessling continued by stating, "[G]iven that kind of background and resources, it is very difficult for that person to behave appropriately. They do not have the opportunity to develop the kind of skills and the appropriate emotional reactions that enable you to be a functional, normally healthy, normally productive person."

{¶ 85} Dr. Jeffrey Smalldon, a clinical psychologist, also evaluated Garner. Dr. Smalldon testified that the results of the tests administered to appellant indicated quite clearly that Garner has some degree of underlying brain impairment and that he functions in a borderline range of intellectual functioning between mild retardation and low average IQ. Dr. Smalldon testified that Garner has residual

attention deficit disorder and a diagnostic impression of marijuana abuse, possibly marijuana dependence. Dr. Smalldon also testified that Garner has a mixed personality disorder with borderline antisocial features.

{¶ 86} Dr. Smalldon also testified about certain factors that have an important effect and continuing influence on the development of a disorder such as Garner's and applied those factors to Garner's lifestyle and upbringing. One of the factors discussed was parental bonding. Dr. Smalldon theorized that the necessary bonding process between Garner and his mother would have been profoundly disrupted when appellant returned to the hospital for the first nine months of his life due to his failure to thrive.

{¶ 87} Other factors Dr. Smalldon applied included environmental factors and appropriate role models during Garner's childhood. Dr. Smalldon testified that appellant was traumatized by the environmental influences to which he was exposed, including the lack of parental figures and role models. Garner had virtually no structured opportunities for learning, enrichment, or stimulation. Garner's biological father denied paternity, and the primary male figure in the household while Garner was a child was George Cunnigham, the man who repeatedly sexually abused Garner's sister. Many of Garner's mother's subsequent boyfriends were abusive to Garner and his siblings. Appellant had no consistent, physically present, emotionally available parental figure in his early life. The only consistency in his life was the pattern of irresponsible behavior, inadequate attention to his needs, and his exposure to violent and repeated sexual and physical abuse from his older brother and frequent physical abuse from his mother.

{¶ 88} Even Dr. Joseph Schroeder, a rebuttal witness for the state, testified that Garner had a brain impairment and that his IQ showed that he is in the below average and borderline range, *i.e.,* on the border between below average and mental retardation.

**{¶ 89}** When continually pressed by the state with regard to whether Garner knew the difference between right and wrong, Dr. Schroeder answered, "[t]here is no psychological tests [*sic*] that we can administer that is designed solely to discern right from wrong." Dr. Schroeder's job was to determine whether Garner was competent to stand trial and whether there were any neuropsychological problems. Defense counsel did not raise the issue of insanity as a defense. Therefore, the prosecution's attempts to turn the history, character and background of the defendant into an argument that Garner did *not* lack the substantial capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law were irrelevant.

**{¶ 90}** The prosecution believed that the psychological testimony was somehow supposed to lead the jury to believe that the organic brain injury caused Garner to act as he did. This was not the argument presented by the defense. The organic brain injury had nothing to do with the motivation behind the burglary and fires. Nor did the injury in any way cause Garner not to be able to appreciate the criminality of his conduct. Appellant's history, character and background were presented solely for purposes of mitigation.

**{¶ 91}** Garner's age, both chrnological and mental, is an additional mitigating factor. At the time of the offense, Garner, it appears, had just turned nineteen. However, he was much younger than nineteen mentally and emotionally. This court held in *State v. Rogers* (1985), 17 Ohio St.3d 174, 17 OBR 414, 478 N.E.2d 984 (Wright, J., concurring in part and dissenting in part), vacated (1985), 747 U.S. 1002, 106 S.Ct. 518, 88 L.Ed.2d 452, paragraph seven of the syllabus, that "[t]he word 'age' as used in R.C. 2929.02(A), 2929.023, 2929.03 and 2929.04 refers to a defendant's chronological age." In my dissent, I stated that I could not "sanction the electric chair for a person with the mentality of a child ***." *Id.* at 188, 17 OBR at 427, 478 N.E.2d at 997. I continue to hold to this belief today.

**{¶ 92}** Garner did commit a heinous crime. Although his youth alone would not be enough to persuade me to overturn the lower court's sentence of death, his youth, combined with his atrocious upbringing, is enough to convince me that justice would be served if Garner were sentenced to the maximum prison term allowed by law. This means that Garner would serve up to one hundred and fifty years in prison for the murder charges; ten to twenty-five years on the aggravated burglary charge and on each of the aggravated arson charges; and two years each for the theft charge and the two charges of receiving stolen property. This certainly amounts to life without parole.

**{¶ 93}** To quote Chief Justice Moyer: "The crime was committed, not after defendant had matured to an age when education, normal life experiences, and maturity could have intervened, but so soon after the brutally abusive conditions created by his family that I am compelled to find that the death sentence is not appropriate for the defendant in this case." *State v. Murphy* (1992), 65 Ohio St.3d 554, 588, 605 N.E.2d 884, 910 (Moyer, C.J., Wright and Herbert R. Brown, JJ., dissenting).

**{¶ 94}** The same philosophy holds true for this case. William Garner never had a chance at a normal life. He was born into an atmosphere of violence, deprivation, and abuse. He had a borderline IQ and an organic brain impairment. He suffered physical, mental, sexual, and emotional abuse his entire life. He lacked proper nourishment, appropriate discipline, parental bonding, appropriate role models and any semblance of a normal childhood.

**{¶ 95}** For the reasons stated above, I dissent from the majority's affirmance of Garner's death sentence.

———————————