DECISION AND JUDGMENT ENTRY
This is an appeal from a judgment of the Lucas County Court of Common Pleas which denied the petition of defendant-appellant, Vernon Lamont Smith n/k/a Abdullah Sharif Kaazim Mahdi ("Mahdi"), to vacate or set aside his sentence pursuant to R.C. 2953.21. From that judgment, appellant raises the following assignments of error on appeal:
 "NO. I THE TRIAL COURT ERRED IN DISMISSING ALL OF APPELLANT'S CLAIMS ON THE BASIS OF RES JUDICATA IN VIOLATION OF APPELLANT'S RIGHTS UNDER THE FIFTH, SIXTH, EIGHTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION.
 "NO. II THE TRIAL COURT ERRED IN DISMISSING ALL OF APPELLANT'S CLAIMS ON THE BASIS THAT THE PETITION DID NOT ALLEGE SUFFICIENT OPERATIVE FACTS WARRANTING RELIEF, IN VIOLATION OF APPELLANT'S RIGHTS UNDER THE FIFTH, SIXTH, EIGHTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION."
Although the facts of this case are fully set forth in this court's opinion on the direct appeal from appellant's conviction, see State v.Smith (Feb. 6, 1998), Lucas App. No. L-94-093, unreported, we will repeat herein those facts necessary to an understanding of the issues before us.
On March 15, 1994, appellant was convicted of three counts of aggravated robbery with firearm specifications and one count of aggravated murder with a capital specification and a firearm specification. At the conclusion of the mitigation phase of the trial, the jury recommended that appellant be sentenced to death. That trial was the result of charges that were filed against appellant after the events of May 26, 1993. Shortly after 8:00 that evening, Sohail Darwish was working in his store, the Woodstock Market. His friend, Osand Tahboub, was there visiting when two young black men entered the store. One of the men went to a cooler, withdrew two forty-ounce bottles of beer and brought them to the counter. As Darwish moved behind the counter, one of the two men drew a pistol and ordered him to open the cash register. At the same time, the second man came around the counter and began pushing buttons in an unsuccessful attempt to open the register. Darwish then moved forward and opened the cash drawer. As the second man began to take money from the cash drawer, the first ordered Darwish to hand over his wallet. As Darwish reached for his wallet, the first man fired a single shot striking Darwish just below the left collarbone. The gunman then turned to Tahboub and took his wallet. As the two fled, Darwish triggered the alarm.
Ultimately, Darwish was transported to a hospital where he was pronounced dead a short time later.
An investigation led police to three men: appellant, Herbert Bryson and Lamont Layson. Through a photo array, Tahboub identified Bryson as the man who cleaned out the cash register and appellant as the gunman who shot Darwish. Layson was the driver of the get away vehicle. All three men were named in a five count indictment which charged three counts of armed robbery. Bryson and Layson were accused of aggravated murder and appellant was charged with aggravated murder in the commission of an aggravated robbery in which he was the principal offender, a capital offense. All counts contained firearm specifications.
At trial, Tahboub again identified appellant as the man who shot Darwish. In addition, a witness who had been standing outside the market and who was acquainted with appellant also placed him at the scene. As part of a plea agreement, appellant's accomplices also testified against him. Bryson testified that he was standing only a few feet from the victim when appellant's gun went off. He also reported that when he later asked appellant why he shot Darwish, appellant replied, "* * * he took too long." The driver, Layson, denied advanced knowledge that appellant was armed. Layson testified that he was waiting in the car when he heard a "pop" from inside the market. A few minutes later, Layson saw appellant and Bryson coming out of the market with appellant carrying a pistol. In addition, Layson confirmed Bryson's account of appellant's explanation as to why he shot the store clerk. Layson added, however, that appellant maintained that he had only shot the victim in the arm.
At the sentencing phase of the trial, appellant called several mitigation witnesses. First among these was an Islamic counselor whom appellant met while incarcerated pending trial. Jurry Taalib-Deen recounted appellant's conversion to Islam and reported that appellant now counsels other prisoners. Taalib-Deen also testified to a conversation with appellant concerning the shooting. Appellant, according to the counselor, admitted shooting Darwish, but said the shot was unintentional. Appellant told the counselor that he was "* * * nervous and scared and the trigger went off." According to the counselor, appellant expressed his regret over what happened.
Appellant's wife testified to the couple's struggles and recounted the events leading to and following the incident. This included attending the movie "Menace II Society" the afternoon before the shooting. In the film, two young African-American men rob a convenience store and shoot the clerk. Appellant's wife also testified that on the day after the shooting, appellant was upset and nervous. He arose early and watched both the early morning news and the noon edition. When it was reported that the victim had died, appellant, according to his wife, "* * * just sat down and * * * cried."
Appellant's mother testified that appellant was the oldest of three children who knew little of his natural father. Appellant was raised by his mother and a stepfather. Their's was a tempestuous relationship which included physical abuse inflicted by the stepfather on appellant's mother. Appellant observed the abuse take place. The couple eventually divorced when appellant was nine years old. According to appellant's mother, the family moved frequently, resulting in appellant's attendance at four elementary schools in as many years. Appellant later was suspended from school many times for fighting. Appellant's mother reported that she attempted to discipline him by grounding and beating him with a belt, but perceived little behavioral change.
Next, appellant's aunt and uncle, Patricia and Ronald Dickerson, testified. Patricia Dickerson testified that she had periodically seen appellant as he was growing up and stated that he was raised in a typical black neighborhood or ghetto that was full of crime and violence. She further stated that appellant was not given much supervision as he was growing up. She then opined that appellant had a very hard life and had to deal with the "street life" at a young age. She further stated that appellant did not have people in his life to help push him in the right direction although she admitted that she had tried to talk to him on several occasions to stress the importance of an education and of staying out of the streets.
Ronald Dickerson, appellant's uncle, also testified although he admitted that he had not had much contact with appellant while appellant was growing up. He did, however, relay one event in appellant's life when appellant was fourteen years old and showed up on Dickerson's door step one night looking for a place to sleep.
Finally, Dr. Robert Kahl, a clinical psychologist, testified in mitigation. Dr. Kahl was retained by the defense to perform a psychological evaluation of appellant. To this end, the psychologist administered a series of tests over a period of several days.
Dr. Kahl testified that appellant initially presented himself as a fairly normal individual of average intelligence. However, the psychologist said that appellant's self-reported history was at odds with the facts. Appellant represented that his stepdaughter was his daughter, his stepfather had stayed in the home longer than he had, and he had not been exposed to any physical violence in the home. The psychologist also reported that appellant cooperated with the testing only so long as the frustration level of the examination was low. As testing became more frustrating, appellant rebelled, eventually refusing to cooperate entirely.
As a result of the tests and psychological evaluation, Dr. Kahl concluded that appellant has, "* * * a defect in his ability to handle feelings and stress" to the extent that in high stress situations, "* * * he becomes psychotic for a temporary period * * * not aware of what he is doing" and unable to conform his conduct to the requirements of the law. The psychologist also offered his opinion that the similarities between the shooting in the movie appellant saw the day of the robbery and appellant's acts during the robbery, "* * * cannot be coincidence." On cross-examination, Dr. Kahl conceded that he could not name a specific psychiatric or psychological condition from which appellant suffered, but attributed this to appellant's refusal to cooperate with the testing.
Upon review of the evidence, the jury found that the aggravating circumstance outweighed the mitigating factors and recommended that appellant be sentenced to death. The trial court agreed and entered judgment in conformity with the jury's recommendation. On direct appeal to this court, appellant raised fifteen assignments of error, fourteen of which we found to be without merit. The one assignment of error which we determined had merit, was cured upon our own statutorily mandated independent reweighing of the evidence in the mitigation phase of the trial. Accordingly, we affirmed the convictions and sentence. On July 26, 2000, the Supreme Court of Ohio further affirmed appellant's convictions and sentence. See State v. Smith (2000), 89 Ohio St.3d 323.
On September 20, 1996, appellant filed in the court below a petition to vacate or set aside his sentence pursuant to R.C. 2953.21. The petition listed ten claims for relief in which appellant asserted that he had been denied his rights under the Ohio and United States Constitutions. The first and ninth claims for relief challenged the constitutionality of Ohio's death penalty statute. The second through eighth claims for relief asserted that appellant had been denied the effective assistance of trial counsel. In particular, appellant alleged that his trial counsel was ineffective for failing to employ an expert in eyewitness identification to test Osand Tahboub's testimony; failing to use a mitigation specialist to investigate appellant's social history; failing to obtain the early assistance of a psychologist to assist in the development of a coherent trial strategy; failing to develop critical testimony of important people in appellant's life who could have testified about the effects of appellant's inner city upbringing on him and about how he changed for the better once he was removed from that environment; failing to seek a continuance in light of communication problems that arose between appellant and Dr. Kahl; failing to present evidence of the impact of appellant's inner city upbringing; and failing to pursue evidence of appellant's lack of intent to cause his victim's death. Appellant's tenth claim for relief alleged that the cumulative effect of the errors and omissions that occurred during his trial deprived him of his constitutional rights. Appellant also requested that the court grant him the opportunity to conduct discovery to further develop and support his claims for relief, and an evidentiary hearing.
Appellant supported his petition with five exhibits. Exhibit One is the affidavit of James P. Reardon, a licensed psychologist who evaluated appellant on September 9, 1996. Reardon concludes that, at the time of the crime, appellant suffered from several long term and significant psychological disorders and that, due to Dr. Kahn's ineffectiveness, these disorders were never revealed to the jury at the mitigation phase of the trial. Exhibit Two is the affidavit of Randall Porter, an attorney certified in capital litigation. Porter attests that he reviewed the transcripts and records from the trial court proceedings and concludes that, for various asserted reasons, appellant's trial counsel was ineffective. Exhibit Three is appellant's own affidavit in which he attests that he did not have a good working relationship with his trial attorneys or with Dr. Kahn. In addition, he gives a brief description of his life while growing up in Toledo and how his life changed when he moved to Dallas, Texas. Exhibit Four is the affidavit of Ke Rogers, appellants godmother, in which she reveals information regarding appellant's childhood. She further states that while appellant lived in Dallas he was responsible and productive and did not develop bad associations with others. Finally, she attests that despite being in contact with appellant's family during the trial court proceedings, appellant's attorneys never contacted her regarding information she might be able to contribute to his defense. Exhibit Five is the affidavit of Dorothy Rogers, Ke Rogers' mother with whom Ke Rogers lives in Dallas. Her affidavit is essentially identical to that of Ke Rogers. In response to appellant's petition, the state filed a motion for summary judgment/motion to dismiss.
On August 23, 1999, the trial court filed its opinion and judgment entry, including findings of fact and conclusions of law.[1] As to the first and ninth claims for relief challenging the constitutionality of Ohio's death penalty statute, the court found that the claims could have been raised on direct appeal and were therefore barred by the doctrine ofres judicata. The court further found that the ineffective assistance of counsel claims and the tenth claim for relief could have been raised on direct appeal and were also barred by res judicata. Finally, the court held that the evidence attached to appellant's petition did not raise sufficient evidence outside the record to warrant a hearing. The court therefore denied appellant's petition to vacate or set aside his sentence without specifically ruling on the state's motion for summary judgment/motion to dismiss. It is from that ruling that appellant now appeals.
Appellant's assignments of error are interrelated and therefore will be addressed together. Appellant asserts that the trial court erred in dismissing all of his claims for relief on the basis of res judicata and on the basis that the petition did not allege sufficient operative facts warranting relief. Although the assignments of error state that appellant is challenging the trial court's ruling on all of his claims for relief, appellant's brief only addresses the court's ruling on seven of the claims for relief that raised issues of ineffective assistance of counsel, claims two, three, four, five, six, seven and ten. Accordingly, we will only address the merits of the trial court's ruling on these seven claims for relief.
R.C. 2953.21 reads in pertinent part as follows:
 "(A)(1) Any person who has been convicted of a criminal offense or adjudicated a delinquent child and who claims that there was such a denial or infringement of the person's rights as to render the judgment void or voidable under the Ohio Constitution or the Constitution of the United States may file a petition in the court that imposed sentence, stating the grounds for relief relied upon, and asking the court to vacate or set aside the judgment or sentence or to grant other appropriate relief. The petitioner may file a supporting affidavit and other documentary evidence in support of the claim for relief.
"* * *
 "(C) * * * Before granting a hearing on a petition filed under division (A) of this section, the court shall determine whether there are substantive grounds for relief. In making such a determination, the court shall consider, in addition to the petition, the supporting affidavits, and the documentary evidence, all the files and records pertaining to the proceedings against the petitioner, including, but not limited to, the indictment, the court's journal entries, the journalized records of the clerk of the court, and the court reporter's transcript. The court reporter's transcript, if ordered and certified by the court, shall be taxed as court costs. If the court dismisses the petition, it shall make and file findings of fact and conclusions of law with respect to such dismissal."
A petition for postconviction relief may be dismissed without an evidentiary hearing when the record indicates that the petitioner is not entitled to relief and that the petitioner did not submit evidentiary documents containing sufficient operative facts to demonstrate that substantive grounds for relief exist. State v. Kapper (1983),5 Ohio St.3d 36, 38. Moreover, pursuant to the doctrine of res judicata, a defendant cannot raise an issue in a petition for postconviction relief if he could have raised the issue on direct appeal. State v. Perry
(1967), 10 Ohio St.2d 175. See, also, State v. Cole (1982),2 Ohio St.3d 112.
When a petitioner asserts ineffective assistance of counsel in a petition for postconviction relief, he bears the initial burden to submit evidence to demonstrate the lack of competent counsel and that the defense was prejudiced by counsel's ineffectiveness. State v. Pankey
(1981), 68 Ohio St.2d 58; State v. Jackson (1980), 64 Ohio St.2d 107. In Ohio, an attorney properly licensed to practice law is presumed to execute his duties in an ethical and competent manner. In order to overcome this presumption of effective assistance, a petitioner in a postconviction relief proceeding must submit sufficient operative facts or evidentiary material which, if proven, would show petitioner was prejudiced by said ineffective assistance of counsel. State v. Smith
(1987), 36 Ohio App.3d 162, 163. Effective assistance of defense counsel does not equate with a winning defense strategy. Debatable tactics do not necessarily constitute a violation of defense counsel's duties. State v.Clayton (1980), 62 Ohio St.2d 45, 49. The fact that a better strategy may have been available does not rise to the level of ineffective assistance of counsel. Id. Appellant must demonstrate that defense counsel's trial tactics prejudiced him. State v. Bradley (1989), 42 Ohio St.3d 136, paragraph two of the syllabus.
Initially, we note that throughout his brief appellant argues that he should have been granted discovery to further develop and support his claims for relief. It is well-established that although a petition for postconviction relief is a civil action, the procedures applicable to such an action are those found in R.C. 2953.21 et seq. Those statutory provisions do not require the trial court to grant discovery during the initial stages of a postconviction proceeding. State v. Fox (May 16, 1997), Wood App. No. WD-96-031, unreported. Rather, "[i]t is petitioner's burden initially to submit evidentiary documents containing sufficient operative facts to warrant a hearing * * *." State v. Rojas (Dec. 29, 1995), Hamilton App. No. C-950091, unreported, citing State v. Zuern
(Dec. 4, 1991), Hamilton App. Nos. C-900481 and C-910229, unreported. Accordingly, the trial court properly refused appellant's request for discovery.
In his second claim for relief, appellant asserted that his trial counsel was ineffective for failing to seek to employ an eyewitness identification expert to test the accuracy of Osand Tahboub's identification of appellant as the assailant. Appellant did not support this claim with any evidence outside of the record. That is, appellant failed to submit evidentiary documents containing sufficient operative facts to demonstrate that his trial counsel was ineffective and that he was prejudiced by such alleged ineffectiveness. Moreover, this claim could and should have been raised on direct appeal. Accordingly, the trial court properly dismissed the second claim for relief without a hearing on the grounds of both res judicata and failure to submit sufficient evidentiary materials.
In his third claim for relief, appellant asserted that his trial counsel was ineffective for failing to use a mitigation specialist to conduct an investigation into his social history. Appellant supported this allegation with the affidavits of himself and Randall Porter. Porter is an attorney who specializes in death penalty cases. In his affidavit he opined that the failure of trial counsel to include a mitigation specialist on the defense team, together with the failure to conduct a meaningful mitigation investigation, led to a mitigation presentation that was of no benefit to appellant. The submission of Porter's affidavit in support of this claim precludes the dismissal of this claim on resjudicata grounds and the trial court erred in applying that doctrine to this claim. Nevertheless, we find that the trial court's application of that doctrine to the third claim for relief amounted to harmless error. The Supreme Court of Ohio has held that a mitigation specialist is not a requirement of effective assistance in capital ligation. State v.McGuire (1997), 80 Ohio St.3d 390, 399. The record of the penalty phase of the trial reveals that appellant's trial counsel did present evidence of appellant's social history and life through the testimony of appellant's mother, aunt and uncle. Moreover, in its independent weighing of the aggravating circumstance and mitigating factors, the Supreme Court of Ohio, in appellant's direct appeal, concluded that appellant's history, character and background were entitled to some mitigating weight under R.C. 2929.04(B)(7). Accordingly, appellant failed to present sufficient evidentiary documents to establish that his trial counsel was ineffective for failing to utilize a mitigation specialist in the proceedings below or to establish that his defense was prejudiced by such alleged ineffectiveness. The trial court, therefore, properly dismissed the third claim for relief.
Appellant's fourth and sixth claims for relief are interrelated. Appellant alleged that his trial counsel was ineffective for failing to obtain the early assistance of a psychologist to assist in the development of a coherent trial strategy and was further ineffective for failing to ask for a continuance when it became apparent that Dr. Kahl could not complete a psychological evaluation of appellant. He alleged that due to counsel's ineffectiveness, he was not evaluated by Dr. Kahl until approximately one month before the trial. By that time, communication problems had developed between appellant and his counsel which carried over into problems between appellant and Dr. Kahl. Appellant asserted that due to these problems Dr. Kahl was not able to complete psychological testing of him and thus was not able to render a specific diagnosis as to any mental disease or defect suffered by appellant. Appellant supported these claims with the affidavits of James P. Reardon, Randall Porter and himself. Reardon attests that his evaluation of appellant revealed that appellant suffers from several long term and significant psychological disorders. He further opined that the psychological mitigation evidence presented at the trial was inadequate at best. Finally, Reardon criticized trial counsel's defense strategy that the movie "Menace II Society" caused appellant to commit the crimes. In his affidavit, Randall Porter opined that the use of Dr. Kahl's testimony in mitigation was damaging to appellant's defense in that Dr. Kahl was not able to define the mental disease or defect with which appellant suffered. Finally, appellant asserted in his affidavit that he did not have a good working relationship with his trial attorneys and that he only met with Dr. Kahl twice prior to trial.
Despite the fact that appellant submitted evidentiary documents in support of these claims, we find that the fourth and sixth claims for relief were properly dismissed on the grounds of res judicata. The fact that Dr. Kahl was unable to complete psychological testing of appellant and render a diagnosis is apparent from the record of the trial court proceedings. In addition, the fact that appellant's trial counsel did not move for a continuance can also be determined from the original record in this case. The doctrine of res judicata will not bar a claim of ineffective assistance of counsel where that claim is based on evidence dehors the record. Cole, supra at 113-114. However, evidence dehors the record must demonstrate that "the petitioner could not have appealed the constitutional claim based on the information in the original trial record." Id. In our view, the incomplete psychological diagnosis of appellant and trial counsel's failure to ask for a continuance in light of that incomplete diagnosis are apparent from the original trial record. Accordingly, the issues could and should have been raised on direct appeal but were not.
In addition, the affidavits submitted in support of appellant's fourth and sixth claims for relief failed to demonstrate that appellant lacked competent counsel or that his defense was prejudiced by counsel's alleged ineffectiveness.
Accordingly, appellant's fourth and sixth claims for relief were properly dismissed by the trial court.
Appellant's fifth and seventh claims for relief will be discussed together. Appellant alleged that his trial counsel were ineffective for failing to present evidence of the impact of appellant's inner city upbringing on him and of how his life changed for the better once he moved to Dallas and was removed from that environment. In support of these claims for relief, appellant submitted the affidavits of Dorothy and Ke Rogers. A review of the trial court proceedings, however, reveals that the jury was presented with evidence of appellant's chaotic upbringing. Accordingly, any additional evidence regarding that upbringing would be merely cumulative. Evidence outside of the record that is merely cumulative to that presented at trial does not demonstrate the violation of an essential duty by trial counsel and, therefore, does not establish ineffective assistance of counsel. State v. Powell (1993),90 Ohio App.3d 260, 270. The evidence regarding appellant's life in Dallas merely presents a mitigation theory that was alternative to or in addition to the one presented at trial. The existence of an alternative mitigation theory does not constitute ineffective assistance of counsel.State v. Combs (1994), 100 Ohio App.3d 90, 98, citing State v. Post
(1987), 32 Ohio St.3d 380, 387-389. Moreover, the decision whether or not to call a witness is a tactical trial strategy and generally will not sustain a claim of ineffective assistance. State v. Williams (1991),74 Ohio App.3d 686, 695. Accordingly, the trial court did not err in dismissing the fifth and seventh claims for relief without a hearing.
Finally, in his tenth claim for relief, appellant alleged that the cumulative errors and omissions presented in the petition prevented appellant from receiving a fair trial. Under the doctrine of cumulative error, "* * * a conviction will be reversed where the cumulative effect of errors in a trial deprives a defendant of the constitutional right to a fair trial even though each of numerous instances of trial court error does not individually constitute cause for reversal." State v. Garner
(1995), 74 Ohio St.3d 49, 64. The doctrine only applies in cases of multiple instances of harmless error. Id. Because the present case was not replete with multiple instances of harmless error, the doctrine does not apply and the trial court properly dismissed the tenth claim for relief.
Having concluded that the trial court properly dismissed appellant's claims for relief without a hearing, we find appellant's assignments of error not well-taken.
On consideration whereof, the court finds substantial justice has been done the party complaining and the judgment of the Lucas County Court of Common Pleas is affirmed. Appellant is ordered to pay the court costs of this appeal.
JUDGMENT AFFIRMED.
A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. See, also, 6th Dist.Loc.App.R. 4, amended 1/1/98.
Melvin L. Resnick, J., James R. Sherck, J., Mark L. Pietrykowski,P.J., CONCUR.
[1] The trial court originally ruled on appellant's petition on February 26, 1998, granting the state's motion for summary judgment/motion to dismiss. On appeal, however, this court found that the trial court never ruled on the actual claims for relief and remanded the case to that court for such a ruling.