OPINION
Defendant-appellant Darnell Mosley appeals his conviction and sentence from the Stark County Court of Common Pleas on one count of aggravated robbery with a firearm specification in violation of R.C. 2911.01 and one count of felonious assault in violation of R.C. 2903.11. Plaintiff-appellee is the State of Ohio.
 STATEMENT OF THE FACTS AND CASE
On November 8, 2000, the Stark County Grand Jury indicted appellant on one count of aggravated robbery in violation of R.C. 2911.01, a felony of the first degree, and one count of felonious assault in violation of R.C. 2903.11, a felony of the second degree. The charge of aggravated robbery carried a firearm specification. At his arraignment on November 17, 2000, appellant entered a plea of not guilty to the charges contained in the indictment. Thereafter, a jury trial commenced on March 29, 2001. The following evidence was adduced at trial.
On September 21, 2000, T'monne Miller was sitting in his car eating breakfast from McDonald's between 10:00 a.m. and 11:00 a.m. while waiting for his girlfriend to page him to take her to the doctor. While he was sitting in his car, a man, who Miller did not know, walked up to the driver's side window and asked Miller a question about drugs. Miller previously had seen the same man, who he identified at trial as appellant, in a light blue Cadillac with another individual.
After he turned away from appellant, Miller looked back and saw appellant holding a gun near Miller's face while telling Miller "to take off everything". Trial Transcript at 283. While Miller began taking off his clothing, the other man, who Miller referred to at trial as Lebeau Carpenter, attempted to take the stereo out of Miller's car. According to Miller, "[a]t first, he couldn't get it out at first. Then I lift down the glove box, take out this one piece so he could. He just yanked it out after I took the piece off." Trial Transcript at 286. Once Miller had taken off all of his clothes except his T-shirt and white basketball shorts, appellant struck him on the left side of his nose with a gun and told Miller to get out of his car.
Upon Miller exiting his car, appellant then walked Miller to the back of the car and told him to open up his trunk. While walking towards the back of his car, Miller, at appellant's command, took off his T-shirt and shorts, leaving only his boxer shorts on. After Miller hesitated for a minute while his key was in the trunk, Lebeau Carpenter struck him in the right eye, causing Miller to fall a couple of steps backwards. Appellant then told Miller to return to the trunk. However, instead, Miller ran to the house of Rose Carter, whose son was a friend of Miller's. Miller testified that while running, he heard one gunshot behind him and that he fell, injuring his hand.
When Miller arrived at her house, Rose Carter gave him a robe to put on and later, when her daughter arrived, Miller was given a pair of shorts and a shirt to wear. Although he was at Carter's house for over an hour, appellant did not call the police but rather attempted to get a hold of his father. After he was driven to his father's home, Miller was taken to the hospital where he told the receptionist what had happened. In all, Miller's clothes, stereo, pager and wallet containing $300.00 were taken.
While at the hospital, Miller spoke with Sergeant Bruce Allison and told him that he had been robbed by two black males. In addition, while Miller was at the hospital, photographs were taken of the injuries to his nose and hand. Although he testified that he did not know appellant, Miller was able to give appellant's name to Sergeant Allison. When the Sergeant arrived at the scene of the incident, he found and photographed Miller's car, which contained clothing but no stereo, and also spoke with Rose Carter. Subsequently, after receiving the names of suspects, Sergeant Allison put together photo arrays. Miller picked both appellant and Lebeau Carpenter out from the arrays. Photographs of Miller's car and of injuries to his nose and hand, were admitted into evidence along with the photo arrays.
At trial, Canton Patrolman Mark Diels testified that, upon arresting appellant and Carpenter eight days after Miller's robbery, he recovered a gun from the trunk of a Delta 88 on the scene. The gun, which was registered to a Jerome Anderson, was excluded from evidence since it was determined at trial that it was not the gun used during the robbery.
Lebeau Carpenter, who previously had pled guilty to aggravated robbery with a firearm specification and felonious assault in connection with the incident involving Miller, testified at appellant's trial. As noted by both appellant and appellee, Carpenter was uncooperative and argumentative on the stand and claimed to have no memory of incidents that occurred just days before. When questioned, Carpenter, who was declared a court's witness, admitted that he had sent a letter to Miller while he was in jail in which he apologized for the robbery. In one line of the letter, which was quoted by appellee, Carpenter wrote that he was "sorry for the bullshit I pulled — I wasn't really on that shit about robbing you. . . . that was the nigger with the gun".
After appellee played a taped statement of a conversation that Carpenter had with Sergeant Allison[1], Carpenter testified that "[t]here was a gun. But I didn't have a gun, Darnell [appellant] didn't have a gun. Nobody had a gun but T'monne [Miller]; . . ." Trial Transcript at 250. On cross-examination, Carpenter testified that in addition to beating Miller up, he wanted to humiliate Miller by having him remove his clothes. The following is an excerpt from Carpenter's testimony at trial:
Was Darnell Mosley there with you?
 A. He was not with me. He was around. He was not with me directly.
Q. Did you come in the same car?
 A. Yeah, we came to the neighborhood in the same car; and he dropped me off. I was coming back, I was going a whole another way; and I seen T'monne.
T'monne walked up on me as I was leaving Darnell.
 Q. You told Detective Allison that all Darnell did was stand there and watch?
A. That's all he did, watch.
Q. So he was there, right?
 A. Well, you could say — well, he was there but he had nothing to do with it. Yeah, he was there; but he had nothing to do with it.
Trial Transcript at 261. In addition, Carpenter testified that Miller fired the gun.
Larrica Grimes, who was 17 years old as of the date of the trial and who also had been interviewed by Sergeant Allison, also testified for the prosecution. Grimes, who testified that she knew Miller, Carpenter and appellant, testified that she was at a friend's house in late September of 2000 when appellant asked her if Miller "was messed up or anything". Trial Transcript at 179. Grimes further testified that appellant and Carpenter, who was also present, were laughing and snickering while talking about Miller. Due to her non-cooperative behavior, Grimes was declared a court's witness. After that, Grimes admitted that she had told Sergeant Allison that appellant asked her about a Detective who had been "down at your, by your house where, um, T'monne got robbed at". Trial Transcript at 191. Grimes further testified that, while at her friend's house, Carpenter showed her a gun which looked similar to one that had been seized upon appellant's arrest by Patrolman Diels. After being recalled by appellee following Carpenter's testimony, Grimes testified that Carpenter told her that the gun was "what we broke the nigger's nose with". Trial Transcript at 265. Grimes believed that Carpenter was referring to Miller.
The last witness who testified on behalf of the prosecution was Rose Carter. Carter testified that between 10:00 a.m. and 11:00 a.m. on September 21, 2000, she was watching television in her house when Miller, who was clad only in boxer shorts and whose face was bleeding, came to her door and told her that he had been robbed. Prior to Miller's arrival, Carter had heard a sound that she thought was a firecracker. When she looked out of her window, Carter saw a turquoise Cadillac going down the alley. According to Carter, Miller, who told her that he had been shot at, was "scared" and "shaking". Trial Transcript at 349. Carter further testified that Miller was at her house for about an hour to an hour and a half.
At the conclusion of the evidence and the end of deliberations, the jury, on April 3, 2001, found appellant guilty of aggravated robbery with a firearm specification and felonious assault. As memorialized in a Judgment Entry filed on April 16, 2001, appellant was sentenced to a prison term of eight years on the charge of aggravated robbery and three years on the gun specification, to be served consecutively. The trial court further sentenced appellant to a six year prison sentence on the felonious assault charge and ordered that the same be served concurrently with the aggravated robbery sentence. Finally, the trial court ordered that the above sentences be served consecutively with appellant's sentence in another case.
It is from his conviction and sentence that appellant now prosecutes his appeal, raising the following assignments of error:
 APPELLANT'S CONVICTIONS FOR AGGRAVATED ROBBERY WITH A GUN SPECIFICATION AND FELONIOUS ASSAULT WERE AGAINST THE MANIFEST WEIGHT AND SUFFICIENCY OF THE EVIDENCE.
 THE TRIAL COURT VIOLATED APPELLANT'S RIGHTS TO DUE PROCESS OF LAW BY FAILING TO GRANT A MISTRIAL AFTER THE ARRESTING OFFICER TESTIFIED AS TO APPELLANT'S POST-MIRANDA SILENCE.
 I
Appellant, in his first assignment of error, contends that his conviction for aggravated robbery with a gun specification and felonious assault were against the manifest weight and sufficiency of the evidence. We disagree.
In State v. Jenks (1981), 61 Ohio St.3d 259, the Ohio Supreme Court set forth the standard of review when a claim of insufficiency of the evidence is made. The Ohio Supreme Court held:
 An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. The relevant inquiry is whether, after reviewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.
 Jenks, supra, at paragraph two of the syllabus. On review for manifest weight, a reviewing court is to examine the entire record, weigh the evidence and all reasonable inferences, consider the credibility of the witnesses and determine "whether in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed . . . The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction." State v. Thompkins (1997), 78 Ohio St.3d 380, 387, citingState v. Martin (1983), 20 Ohio App.3d 172, 175. Because the trier of fact is in a better position to observe the witnesses' demeanor and weigh their credibility, the weight of the evidence and the credibility of the witnesses are primarily for the trier of fact. State v. DeHass (1967),10 Ohio St.2d 230, syllabus 1.
As is stated above, appellant was convicted of aggravated robbery in violation of R.C. 2911.01. Such section states, in relevant part, as follows:
 (A) No person, in attempting or committing a theft offense, as defined in section 2913.01 of the Revised Code, or in fleeing immediately after the attempt or offense, shall do any of the following:
 (1) Have a deadly weapon on or about the offender's person or under the offender's control and either display the weapon, brandish it, indicate that the offender possesses it, or use it;
Pursuant to R.C. 2941.145, the gun specification attached to such charge required the jury to find that a firearm was brandished or used to commit the offense. Appellant also was convicted of felonious assault in violation of R.C. 2903.11 which provides, in pertinent part, as follows:
 (A) No person shall knowingly do either of the following:
 (1) Cause serious physical harm to another or to another's unborn;
 (2) Cause or attempt to cause physical harm to another or to another's unborn by means of a deadly weapon or dangerous ordnance.
Construing the evidence in a light most favorable to the prosecution, we find that any rational trier of fact could have found beyond a reasonable doubt that appellant committed the offenses of aggravated robbery with a firearm specification and felonious assault. As is set forth in detail in the statement of facts, Miller, the victim herein, testified that he was robbed of his clothes, his pager, money and his stereo at gunpoint by appellant and Lebeau Carpenter. According to Miller's testimony, both appellant and Carpenter struck him in the face with a gun during the robbery and, when Miller ran away, Carpenter actually fired the gun at appellant. While appellant contends that Miller's testimony was not credible since he delayed for over an hour before contacting the police after the robbery, we concur with appellee that Miller's testimony was corroborated by that of Rose Carter and by the photographs of Miller's car and Miller's injuries that were admitted into evidence. During her testimony, Rose Carter testified that on the day in question, she heard what she thought was a firecracker and then saw a turquoise Cadillac going down the alley before finding Miller at her doorstep. According to Carter, Miller, who claimed to have been robbed, was in his boxer shorts and was scared and bleeding. Carter further corroborated Miller's testimony that Miller remained at Carter's house for over an hour before going to his father's house. As noted by appellee in its brief, "Carter's testimony corroborated Miller's testimony in all respects." At trial, photographs of Miller's car with the stereo removed and of the injuries to Miller's nose and hand, which were admitted into evidence, also corroborated Miller's account.
Furthermore, the jury, as trier of fact, clearly was in the best position to assess all of the witnesses' credibility and the photographs admitted at trial. Clearly, the jury found T'monne Miller to be a credible witness and, based upon their assessment of credibility, chose to believe the parts of Grimes' testimony and Carpenter's testimony that implicated appellant in the robbery.
Based on the foregoing, we find that any rational trier of fact could have found beyond a reasonable doubt that appellant took part in the theft of Miller's property, that a deadly weapon was either brandished or displayed during the same[2], and that serious physical harm was inflicted on Miller during the theft. Moreover, any rational trier of fact could have found that appellant and Carpenter, by striking Miller in the face with a handgun and by firing a handgun at Miller, knowingly caused serious physical harm to Miller or attempted to cause physical harm to Miller by means of a deadly weapon. Furthermore, based upon the evidence, we cannot say that the jury lost its way so as to create a manifest miscarriage of justice.
Since appellant's conviction for aggravated robbery with a gun specification and felonious assault are not against the manifest weight or sufficiency of the evidence, appellant's first assignment of error is overruled.
 II
Appellant, in his second assignment of error, argues that the trial court violated his right to due process by failing to grant a mistrial after Sergeant Allison, the arresting officer, testified as to appellant's post-Miranda silence. We, however, disagree.
Motions for mistrial are addressed to the sound discretion of the trial court. See State v. Garner (1995), 74 Ohio St.3d 49 at 59. A mistrial should be declared only when justice requires it because it is no longer possible to afford the accused a fair trial. Id. In the case sub judice, during direct examination, the Prosecutor in this matter asked Sergeant Allison whether he had talked with appellant after Miller picked appellant's photo out of the photo array. In response, the Sergeant testified as follows: "Briefly. He stated he wanted an attorney, and at that time I stopped speaking — stopped the interview". Trial Transcript at 147. After appellant's counsel objected to such testimony and moved for a mistrial since "[i]t's a comment on the exercise of the Defendant's right to remain silent and his right to counsel", the trial court instructed the jury to "disregard the last question and answer by counsel; and you are not to consider the last question and answer of the witness for any purpose whatsoever in this case." Trial Transcript at 147, 148. While the trial court indicated that it would be willing to put a curative instruction into the final jury instructions regarding appellant's request for an attorney, counsel for appellant declined the offer of such an instruction and renewed the motion for a mistrial. Both after appellee rested its case and after the defense rested, the motion for a mistrial was renewed and overruled. As is stated above, appellant now specifically maintains that the trial court violated his right to due process of law by failing to grant a mistrial after Sergeant Allison testified as to appellant's post-Miranda silence.
The United States Supreme Court, in Doyle v. Ohio (1976), 426 U.S. 610,618, stated "* * * it would be fundamentally unfair and a deprivation of due process to allow the arrested person's silence to be used to impeach an explanation subsequently offered at trial." In Wainwright v.Greenfield (1986), 474 U.S. 284, the United States Supreme Court reaffirmed its holding in Doyle noting "[i]n Doyle, we held thatMiranda warnings contain an implied promise, rooted in the Constitution, that `silence will carry no penalty.'" Wainwright at 295, quoting Doyle
at 618. The Wainwright court stated at 295, "[w]hat is impermissible is the evidentiary use of an individual's exercise of his constitutional rights after the State's assurance that the invocation of those rights will not be penalized." (Emphasis added).[3]
Upon our review of the record, we find that the trial court did not abuse its discretion in denying appellant's motions for a mistrial. In the case sub judice, the prosecution never used appellant's post-arrest silence for impeachment purposes in cross-examination or in closing argument. See Doyle, supra. Nor did the prosecution ever attempt to make evidentiary use of appellant's silence and/or request for counsel as evidence of appellant's guilt. See Wainwright, supra. and State v.Schirtzinger (Aug. 3, 1988), Licking App. No. 3348, unreported. In fact, appellant's post-arrest silence and request for an attorney was never mentioned again in any context. See State v. Kelly (July 12, 2001), Cuyahoga App. No. 78422, unreported. In short, the record in this matter "discloses no intentional, concerted effort on the part of the prosecution to employ the post-arrest comment in any prejudicial manner." See Schirtzinger, supra. Moreover, right after Sergeant Allison's testimony, the jury was given a cautionary instruction by the trial court directing it to disregard Sergeant Allison's statement as to appellant's request for an attorney. See Schirtzinger, supra.
Appellant's second assignment of error is, therefore, overruled.
Accordingly, the judgment of the Stark County Court of Common Pleas is affirmed.
By EDWARDS, J. GWIN, P.J. and FARMER, J. concurs.
 JUDGMENT ENTRY
For the reasons stated in the Memorandum-Opinion on file, the judgment of the Stark County Court of Common Pleas is affirmed. Costs to appellant.
[1] At trial, Carpenter authenticated the taped statement.
[2] While appellant contends that there was no evidence that the gun was operable, at trial, Miller testified that, upon running from the scene of the robbery, he heard a gunshot behind him.
[3] In Wainwright, the court specifically held that it was fundamentally unfair for the prosecutor to use the defendant's "post-arrest, post-Miranda warnings silence as evidence of his sanity."Id. at 295.