The **STATE of Ohio**, Appellee,

v.

**MURRAY**, Appellant.

[Cite as *State v. Murray*, 186 Ohio App.3d 185, 2009-Ohio-6174.]

Court of Appeals of Ohio,
Twelfth District, Clermont County.

No. CA2009–03–015.

Decided Nov. 23, 2009.

Donald W. White, Clermont County Prosecuting Attorney, and David H. Hoffmann, Assistant Prosecuting Attorney, for appellee.

R. Daniel Hannon, Clermont County Public Defender, and Robert F. Benintendi, Assistant Public Defender, for appellant.

---

POWELL, Presiding Judge.

{¶ 1} Defendant-appellant, Michael Murray, appeals his conviction in the Clermont County Court of Common Pleas for one count of tampering with evidence. We reverse the decision of the trial court.

{¶ 2} According to stipulated facts, Murray's mother, Marilyn, was married to Judson Dalton, and on May 16, 2008, Dalton and Marilyn had an argument. Murray and Dalton agreed that Dalton would accompany Murray back to his apartment and stay at his residence. On the way, Dalton asked Murray to stop at the Robbie Ridge Apartments so that he could purchase crack cocaine. While waiting for the drug dealer in the apartment's parking lot, Dalton exited Murray's truck at around 9:30 or 10:00 p.m. in order to urinate. After Murray noticed that Dalton had not promptly returned, he got out of his truck to check on Dalton's whereabouts. Murray discovered that Dalton had fallen off an 11-foot retaining wall and was lying on the ground at the bottom asking for help.

{¶ 3} Instead of calling 9-1-1 or seeking medical attention, Murray put Dalton in his truck and drove towards his apartment. During the drive, Dalton slumped forward in his seat and his hat fell off, revealing a three-by-five-inch gash in the top of his head. Murray then called his mother and his sister, Michelle Murray, asking them to come to his apartment. Once he arrived at his home, Murray changed his pants and washed his hands. After his sister and mother arrived and assessed the situation, Michelle called 9-1-1 to seek medical help for Dalton.

{¶ 4} The stipulation also incorporated the statements of Murray's sister and mother, as if they were fully rewritten. According to Marilyn Murray, Murray called her sometime after 10:00 p.m. and asked her to come to his apartment because Dalton had fallen from a wall and was bleeding. After Murray told his mother that he did not know what to do, she drove to his apartment and arrived around 11:30 p.m., where she saw Dalton in Murray's truck.

{¶ 5} According to Michelle Murray, Murray called her and told her that Dalton had fallen over the wall. During the phone call, Murray explained to Michelle that he had lifted Dalton into his truck and was on the way back to his residence, where he hoped to meet Michelle. When Michelle arrived at Murray's apartment between 11:10 and 11:20 p.m., she found her brother crying and very upset. After she asked him what had happened, Murray told her that Dalton had

fallen from the wall and "split his head open." When Michelle asked Murray whether Dalton was still alive, he responded that he did not know. Michelle then checked for a pulse and after finding a "slight" pulse, told Murray that they had to call 9–1–1.

{¶ 6} Murray told Michelle that he could not call 9–1–1 and that he wasn't "burning the body." Michelle then told her brother that there were "other ways to get rid of the body" and that the police would help. Murray again stated that he could not call 9–1–1 and wanted to wait for his mother to arrive before doing anything else. Though Michelle suggested that the two move Dalton's body into their mother's car and take him to the hospital, Murray refused because he was not going to "start lying" or get her or their mother "in trouble." According to Michelle's statement, she suggested moving the body into their mother's car so that Murray could avoid another driving-under-suspension ("DUS") charge.

{¶ 7} Around 11:50 p.m., Michelle called 9–1–1. The operator directed her to place Dalton on his back, check his airway, and perform CPR. Michelle verified that nothing was obstructing Dalton's airway and then explained to the operator that she was "scared" to perform CPR because Dalton was positive for HIV and hepatitis C. Shortly thereafter, an emergency crew arrived at the scene and started rescue efforts.

{¶ 8} Milford police also arrived at Murray's home, and Detective Jamey Mills asked Murray to go back to the police station in order to figure out what had happened. After agreeing to accompany Detective Mills to the station, Murray advised the police that he had changed clothes earlier. He then gave Detective Mills the clothes he was wearing at the time he moved Dalton into his truck, including the pants he had changed out of earlier and his socks. Murray also agreed to allow police to tow his truck to the station for examination. Murray's mother, the owner of the vehicle, also agreed to the search.

{¶ 9} On the way to the station, Murray and Detective Mills drove by the Robbie Ridge Apartments. Murray verified that the investigation crew was in the area where Dalton fell and later pointed to the area of the parking lot where he and Dalton had waited for the drug dealer. At the station, Murray waived his Miranda rights and explained to the detectives that while he did not see what happened, he assumed that Dalton had fallen from the wall. When detectives asked Murray why he had moved Dalton, Murray responded that he could not afford another DUS charge. After Detective Mills advised Murray that he "suspected that he and Dalton got into some sort of altercation that led to Dalton's death," Murray "became irate and stated that he wanted a lawyer." At that time, police arrested Murray for tampering with evidence and reckless homicide.

{¶ 10} Murray was indicted on one count of tampering with evidence and waived his right to a jury trial, electing instead to have his case heard by the bench. As stated, Murray and the state submitted a stipulation of facts and then offered closing arguments without the bench hearing from a single witness on either party's behalf. Though not stipulated, the parties made several references during closing arguments to the fact that Dalton had died. However, the court never heard any evidence regarding the cause of death.

{¶ 11} The trial court found Murray guilty and sentenced him to a three-year prison term and postrelease control. Murray now appeals his conviction and sentence, raising the following assignments of error. Because Murray's assertions are interrelated, and for ease of discussion, we will discuss the assignments together.

{¶ 12} Assignment of error No. 1:

{¶ 13} "The trial court erred in entering a finding of guilty to tampering with evidence as the evidence was legally insufficient to sustain such conviction."

{¶ 14} Assignment of error No. 2:

{¶ 15} "The trial court erred in entering a finding of guilty to tampering with evidence because such verdict was against the manifest weight of the evidence."

{¶ 16} In his assignments of error, Murray asserts that his conviction was against the manifest weight and sufficiency of the evidence. We find Murray's argument meritorious.

{¶ 17} When reviewing the sufficiency of the evidence underlying a criminal conviction, an appellate court examines the evidence in order to determine whether that evidence, if believed, would support a conviction. *State v. Wilson,* Warren App. No. CA2006–01–007, 2007-Ohio-2298, 2007 WL 1394631. The relevant inquiry becomes "whether, after viewing the evidence in a light most favorable to the prosecution, any reasonable trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *State v. Jenks* (1991), 61 Ohio St.3d 259, 574 N.E.2d 492, paragraph two of the syllabus.

{¶ 18} "When considering whether a judgment is against the manifest weight of the evidence in a bench trial, an appellate court will not reverse the conviction where the trial court could reasonably conclude from substantial evidence that the state has proven the offense beyond a reasonable doubt." *State v. Eckert,* Clermont App. No. CA2008–10–099, 2009-Ohio-3312, 2009 WL 1914829, ¶ 16.

{¶ 19} We begin our analysis by addressing the stipulation of facts. As stated above, the state and Murray agreed to submit facts to the trial court and to offer closing arguments in lieu of a trial. Because the parties chose to stipulate to the facts instead of presenting testimony, the trial court was unable

to assess witness credibility and was bound by the facts contained in the stipulation. "A stipulation, once entered into, filed and accepted by the court, is binding upon the parties and is a fact deemed adjudicated for purposes of determining the remaining issues in that case. A party who has agreed to a stipulation cannot unilaterally retract or withdraw it." *State v. McCullough*, Putnam App. No. 12–07–09, 2008-Ohio-3055, 2008 WL 2485366, ¶ 20.

{¶ 20} While we have already summarized the stipulation in our statement of facts, we address the stipulation now to echo the trial court's distress regarding the impact the submitted facts had on the court's analysis, and on our own. Before the trial court heard closing arguments, it addressed the state and Murray regarding the stipulation. The court warned the parties that without hearing from witnesses, it was unable to address credibility or to decide what weight to give the witnesses' statements. The court quoted various sections of the stipulations wherein doubt was cast over the actual events of the night.

{¶ 21} Specifically, regarding Murray's explanation of finding Dalton, the stipulation reads, "[T]he defendant claims that when Mr. Dalton did not return, he got out of the car and went to find him. Further, the defendant claims he found Mr. Dalton at the bottom of an eleven foot retaining wall. According to the defendant, Mr. Dalton had fallen over the rail at the top of the retaining wall, and was laying at the bottom asking for help."

{¶ 22} Based on the blatant uncertainty raised by the stipulation, the trial court explained to the state that without first hearing testimony, it could not "look at words and decide whether what somebody says is true." The trial court then gave the parties time to decide whether they wanted to proceed with a trial or to give closing arguments based on the stipulation of facts as planned. After a recess, the state and Murray informed the court that they would proceed, and the following exchange occurred:

{¶ 23} "Court: There's been an agreed stipulation of facts and evidence presented to the Court. * * * this essentially is going to be all the facts for the Court to—"

{¶ 24} "State: That is correct, Judge." (Interruption sic.)

{¶ 25} Though it was not required to do so, the court accepted the stipulation and was therefore bound to the facts, as are we on appeal. Therefore, we are required to accept the statements, evidence, and facts presented in the stipulation and witness statements (incorporated by reference as if fully rewritten) as the undisputed facts integral to our analysis. Based on the submitted facts, and according to the record as a whole, Murray's conviction for tampering with evidence was not supported by the manifest weight or sufficiency of the evidence, and must be reversed.

{¶ 26} According to R.C. 2921.12(A), "no person, knowing that an official proceeding or investigation is in progress, or is about to be or likely to be instituted, shall do any of the following: (1) alter, destroy, conceal, or remove any record, document, or thing with purpose to impair its value or availability as evidence in such proceeding or investigation." Therefore, in order for Murray to have been convicted for violating the statute, the state had to prove that the stipulation of facts fulfilled the following elements of the offense beyond a reasonable doubt: "(1) that a defendant knows that an official proceeding or investigation was in progress or was likely to be instituted; (2) that the defendant, with such knowledge, altered, destroyed, concealed or removed any evidence; and (3) the foregoing conduct was for the purpose of impairing the evidence's availability in any such proceeding or investigation." *State v. Moore* (Jan. 20, 1992), Scioto App. No. 91CA1966, 1992 WL 10117, *2.

{¶ 27} Regarding the first element, we must first determine whether Murray knew that an official proceeding or investigation was likely to be instituted. According to R.C. 2901.22(B), "a person has knowledge of circumstances when he is aware that such circumstances probably exist."

{¶ 28} Specific to knowledge that a criminal investigation is underway or imminent, we will employ a reasonable-person standard and focus on the defendant's intent, rather than the purpose of the criminal investigation. *State v. Mann*, Clermont App. No. CA2006–05–035, 2007-Ohio-1555, 2007 WL 959904. "The law has long recognized that intent, lying as it does within the privacy of a person's own thoughts, is not susceptible of objective proof. The law recognizes that intent can be determined from the surrounding facts and circumstances, and persons are presumed to have intended the natural, reasonable and probable consequences of their voluntary acts." *State v. Garner* (1995), 74 Ohio St.3d 49, 60, 656 N.E.2d 623.

{¶ 29} In determining whether Murray acted with the requisite knowledge, we must first consider what investigation was contemplated under the statute. The trial court noted at the beginning of its analysis that Murray was charged with tampering with evidence, with the evidence being Dalton's person. According to the stipulation of facts, Murray left the parking lot fearing that he would be charged with DUS. However, the court concluded that it could not reasonably infer that Dalton's person was evidence that Murray was trying to make unavailable for an investigation into a potential DUS charge. Instead, the court concluded that the proper question was whether Murray knew that an official investigation was likely to be instituted into the circumstances surrounding Dalton's injuries. While we agree that the trial court asked the proper question, we disagree with the court's conclusion that Murray knew that Dalton's fall would result in an official investigation.

{¶ 30} Instead, and based on the totality of the circumstances, we cannot say that a reasonable person would know that an investigation was likely to ensue. According to the stipulation, Dalton and Murray were in the parking lot waiting for a drug dealer when Dalton informed Murray that he was stepping out of the truck to urinate. When Dalton did not return promptly, Murray exited his truck and found Dalton at the base of the wall. When Murray approached Dalton, Dalton was conscious and asking for help "to get into the truck."

{¶ 31} The act of moving Dalton's person into the truck would have been the alleged tampering, and we must determine Murray's mental state at the moment he removed Dalton from the ground and helped him into the truck. Reality dictates that people fall and injure themselves on a regular basis. However, it is undeniable that police do not investigate every injury or fall. Even assuming that Dalton died as a result of his fall, and assuming in hindsight that Dalton's injuries were ultimately fatal, the stipulated facts do not indicate that Murray was aware of the severity of Dalton's injuries at the moment he moved Dalton to the truck. Instead, after Dalton fell, Murray went to his side and found Dalton conscious and asking for help back into the truck. At that time, there was no indication that Dalton's injuries were life-threatening or that help from emergency-response personnel was required.

{¶ 32} Instead, the first indication that Dalton's injuries were serious occurred during the drive back to Murray's apartment after Murray had already moved Dalton into the truck and after the supposed tampering had occurred. According to the stipulated facts, after Dalton was already in the truck and back on the road towards Murray's apartment, Dalton slumped over and his hat fell off, revealing a large gash in Dalton's head. After seeing the cut, Murray then called his mother and sister to ask for help.

{¶ 33} The trial court reasoned that "any reasonable person would consider a fall down an eleven foot retaining wall to be a situation in which potentially life-threatening injuries could be incurred by Dalton." Even so, the focus of the reasonable person's mindset (and resulting intent) would be to assess the injuries and, if necessary, seek medical attention. A reasonable person, however, would not necessarily assume that an official investigation would occur or that medical personnel would have any reason to doubt that a person could fall over a wall while trying to urinate.

{¶ 34} At the point that Murray noted the gash, had he called 9-1-1 or sought medical attention, a reasonable person would assume that medical personnel would need the details of the fall to assist in their treatment and diagnosis. However, explaining details to medical personnel is markedly different from being involved in an official investigation. As one court noted, an official investigation generally means an "inquiry into the legality or illegality of facts

which is in process of being made by officials of one or more levels of government, law enforcement." *State v. Diana* (Dec. 23, 1975), Franklin App. Nos. 75AP–210 and 75AP–211, 1975 WL 182044, *7. Although the trial court concluded that a reasonable person would *assume* that medical attention was necessary, we cannot agree that the same reasonable person would *know* that an official investigation was likely to commence. Instead, it is widely known and accepted that an official investigation does not result every time a person injures himself.

{¶ 35} This is the juncture at which the trial court varies from the stipulated facts and makes an inference not supported by the manifest weight of the evidence. In concluding that Murray knew an investigation was likely to occur, the trial court noted that "the defendant knew that Dalton and his mother had been arguing earlier that night. He knew he was the only person with Dalton at the time of the incident. He knew that Dalton fell down an eleven foot retaining wall. A reasonable person would know that these somewhat suspicious circumstances would lead the police to inquire into and investigate the circumstances which led to the fall." By relying on these supposed suspicious circumstances, the trial court inferred some sort of malfeasance that is not supported by the stipulated facts or the record.

{¶ 36} We recognize that the trial court was in an awkward position. While it had the stipulation of facts before it, it also heard the state's closing arguments in which the prosecutor made reference to Dalton's body and that his death was a result of the laceration he sustained from the fall. However, the stipulated facts lacked any indication as to Dalton's cause of death or even that the laceration resulted from the fall.

{¶ 37} During closing arguments, the state also said that after Dalton was alone with Murray, he "sustain[ed] a fatal injury and die[d]." Later in closing arguments, the state alluded to the fight between Dalton and Marilyn and to the fact that Murray was the last person to see Dalton alive. The state then posed a rhetorical question to the court: "Was this strictly an accident? Was this, you know, something more nefarious than that? Now, we're not stating that the Defendant did in fact kill Judson Dalton, but what we are arguing, Judge, is that we don't know."

{¶ 38} Whether it was convinced that Murray was responsible for Dalton's death, by virtue of the stipulation, the state accepted as fact that Dalton fell while urinating. The trial court, noting the binding effect of the stipulation, stated in its written decision that "no matter how suspicious the chain of events on the evening in question appears to be, this court cannot circumvent the facts to which the state willingly stipulated."

{¶ 39} However, by assuming that a reasonable person would know that the police would investigate "suspicious" circumstances, the court *did* circumvent the

stipulated facts and inferred a nefarious intent where none existed. While the trial court assumed that the events surrounding the fall were "suspicious," there are multiple possibilities that could have happened in the moments preceding Dalton's fall. Just as easily, the trial court could have read the stipulation and witness statements and inferred that Dalton was intoxicated or already under the influence of drugs when he attempted to urinate in the parking lot. The trial court could have also inferred that with all of Dalton's medical issues, he was likely to be on various medications that may have affected his balance if mixed with alcohol or narcotics. However, these inferences, both the trial court's and our own, are unnecessary given the parties' stipulation that Dalton fell.

{¶ 40} Had the state elected to call witnesses or had the opportunity to cross-examine Murray, the court could have addressed the witnesses' credibility and assigned weight to the testimony. Instead, the state accepted as fact that Dalton fell, and cannot now assert that he was pushed. Nor can the trial court infer that a fight between Dalton and Marilyn earlier in the day would somehow place Murray on notice that an investigation was likely to occur when Dalton simply fell from a wall while trying to urinate in a parking lot. Therefore, the stipulated facts, and the record as a whole, do not prove beyond a reasonable doubt that Murray had reason to know that an official investigation was likely to ensue.

{¶ 41} Having found that Murray did not have the requisite knowledge to fulfill the first element, we find that the state cannot prove the second element of the offense. Without knowing that the investigation was likely to ensue, Murray could not have, with the required knowledge, altered, destroyed, or concealed evidence as is required by the statute's second element.

{¶ 42} We also find that the state is unable to prove the third element of the offense, mainly that Murray moved Dalton's person for the purpose of impairing the evidence's availability in a proceeding or investigation. According to R.C. 2901.22(A), "a person acts purposely when it is his specific intention to cause a certain result * * *." The trial court found that Murray moved Dalton from the bottom of the wall and concealed him for over two hours so that Dalton's person could not be used as evidence.

{¶ 43} However, according to the stipulated facts and witness statements, Murray was very clear that he moved Dalton into the truck and drove away after Dalton asked for help because Murray "could not afford" another driving-under-suspension violation. Accepting this statement as true, as we are bound to do according to the stipulation of facts, Murray's intent that night was to leave the Robbie Ridge Apartments to avoid incurring a DUS charge, not in order to impair evidence linked to Dalton's fall.

{¶ 44} According to Michelle Murray's statement, after she reached Murray's apartment and assessed the situation, she and Murray discussed what to do with Dalton. At that point, Murray specifically said that he was not going to "burn the body" and that he would not participate in her plan to move Dalton to their mother's car. Murray also told Michelle that he did not want to start lying to the police or to get either Michelle or their mother in any trouble. Michelle specifically explained in her statement that the reason she suggested they move Dalton to their mother's car was so that Murray could avoid a DUS charge. Marilyn Murray's statement also corroborates the fact that Murray did not move Dalton from his truck, and instead, left him there for anyone walking past the truck to see.

{¶ 45} Though the court noted that Michelle, and not Murray, called 9-1-1 to request assistance, the fact remains that Murray knew Michelle was going to call and did nothing to stop her. Murray was fully cooperative once officers initiated an investigation. Specifically, Murray provided the clothing he had changed out of, permitted the officers to tow his truck to the station and search it, confirmed the site of the fall with detectives, implicated himself criminally (drug sales and DUS), and stayed at the police station and answered all questions after waiving his Miranda rights. Therefore, Murray's statement and acts demonstrate that his specific intention at the time he moved Dalton was to avoid a DUS charge and not to conceal Dalton from anyone or to impair his availability in a future proceeding or investigation.

{¶ 46} The trial court reasoned that had Murray truly moved and concealed the body to avoid facing a DUS charge, Murray could have still dropped Dalton off at the hospital or otherwise made sure Dalton received medical help. Was it morally incumbent upon Murray to seek medical attention for Dalton? Perhaps. Does his failure to seek medical attention fulfill the state's burden to prove that Murray's purpose in moving Dalton that night was to impair evidence? No. Although the record and stipulated facts clearly demonstrate that Murray used poor judgment that night, they do not and can not establish that he moved Dalton's person to prevent its use as evidence in a future proceeding or investigation.

{¶ 47} We understand the predicament the state and the trial court faced. Dalton apparently died as a result of falling off a wall, and his stepson was more concerned with avoiding a DUS charge than seeking the medical attention that might have saved Dalton's life. However, manipulating the stipulated facts into a conviction for tampering with evidence appears to be a futile attempt at punishing Murray for his failure to seek medical attention. Murray exercised poor judgment. We cannot, however, state that he is guilty of tampering with evidence under R.C. 2921.12(A).

{¶ 48} Instead, the legal standard when reviewing a sufficiency challenge calls for us to examine the evidence and determine whether that evidence, if believed, supports a conviction. Normally, we are to view the evidence in a light most favorable to the prosecution to determine whether any reasonable trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. There is no need to address whether we *believe* the evidence or to express doubt over the events leading up to and after Dalton's fall. Because the state itself stipulated to the facts we have used to determine whether Murray tampered with evidence, the facts are not in question, and our belief in their validly is meaningless. Instead, the stipulation failed to provide the trial court with substantial evidence to prove beyond a reasonable doubt that Murray tampered with evidence by moving Dalton's person after he fell.

{¶ 49} Having found that the conviction is not supported by the manifest weight or sufficiency of the evidence, Murray's assignments of error are sustained. Murray's conviction is therefore vacated, and he is discharged.

{¶ 50} Judgment reversed and appellant discharged.

Judgment accordingly.

YOUNG and HENDRICKSON, JJ., concur.