[Cite as *State v. Cargill*, 2014-Ohio-2073.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| State of Ohio, | : | |
| Plaintiff-Appellee, | : | |
| | : | No. 13AP-594 |
| v. | : | (M.C. No. 2013-CRB-996) |
| William Cargill, Sr., | : | (REGULAR CALENDAR) |
| Defendant-Appellant. | : | |

D E C I S I O N

Rendered on May 15, 2014

*Richard C. Pfeiffer, Jr.,* City Attorney, *Orly Ahroni,* for appellee.

*Yeura R. Venters,* Public Defender, and *David L. Strait,* for appellant.

APPEAL from the Franklin County Municipal Court

CONNOR, J.

{¶ 1} Defendant-appellant, William Cargill, Sr., appeals from a judgment of the Franklin County Municipal Court, finding him guilty of one count of theft by deception, in violation of R.C. 2913.02(A)(3). Because both sufficient evidence and the manifest weight of the evidence support defendant's conviction, we affirm.

I. FACTS & PROCEDURAL HISTORY

{¶ 2} The state filed a complaint against defendant on January 13, 2013, charging him with the crime of theft by deception, a misdemeanor of the first degree. The complaint alleged that defendant took $250 in cash and two valid tickets to The Ohio State University ("OSU") men's basketball game from the victim, Andrew Jameson, and in

exchange gave Jameson two counterfeit tickets. Defendant waived his right to a jury trial and elected to have the case tried to the court.

{¶ 3} The evidence adduced at trial demonstrated that, on January 13, 2013, Jameson was planning to take his 12-year-old daughter to see the OSU men's basketball game versus the University of Michigan. The game was sold out, but Jameson already had two tickets for the game. Jameson's tickets were for seats located in the terrace of the arena, in Section 300. Jameson's tickets had a face value of $47 each.

{¶ 4} That morning, Jameson parked his car in a parking lot located off of the intersection of Lane Avenue and Fife Avenue, on the OSU campus. Jameson and his daughter exited their car and began to walk toward the arena where the basketball game would take place. As they were walking, Jameson and his daughter "were approached by two black males," one of whom was defendant. (Tr. 13.) Defendant asked Jameson if he needed any tickets. Jameson said "[w]ell, maybe we would consider an upgrade," and at that time Jameson and defendant "started talking price." (Tr. 15.) Defendant offered Jameson two tickets for seats located in Section 105 of the arena. Jameson had "gone to a lot of OSU basketball games" in the past, and was familiar with Section 105, as he had "sat in that section before." (Tr. 16.) Jameson noted that the tickets defendant was offering were a significant upgrade from the tickets Jameson possessed.

{¶ 5} Initially, defendant and his partner wanted $600 total for the tickets they had. Jameson believed the price was too high, and "kept trying to walk away but was stopped" by defendant. (Tr. 15.) Jameson eventually said that his "best offer" was $250 cash for the pair of the two upgraded tickets, plus the pair of tickets to Section 300 that Jameson possessed. Defendant accepted Jameson's offer, defendant and Jameson exchanged the tickets, and defendant paid the $250 cash to "the other gentleman, [defendant's] partner." (Tr. 15.) Jameson recalled that defendant promised him "[g]ood seats" in Section 105. (Tr. 45.)

{¶ 6} When Jameson and his daughter attempted to enter the arena, the ticket taker denied them entrance, as the tickets Jameson had purchased from defendant would not scan. The police officers who were present in the arena came over and inspected the tickets, and informed Jameson that the "tickets [were] invalid" and that he had "been sold some counterfeit tickets." (Tr. 17.) The police noted that the tickets were "very good

counterfeit tickets." (Tr. 17.) Jameson then provided the police with a description of defendant and left the arena, as he had no valid tickets which would allow him entry into the game. The police provided Jameson with a phone number to call in case he saw defendant on the street.

{¶ 7} Jameson and his daughter walked back to Jameson's car and, as they were driving on Lane Avenue, they saw defendant walking on the street. Jameson noted that defendant was not with the same man who had been present when defendant sold Jameson the tickets earlier in the day. Jameson pulled into the parking lot of a Panera Bread store located on Lane Avenue, stopped two police officers who were walking on the street, and explained the situation to them. The police officers then detained defendant. OSU police officer Andrew Gillespie noted that, when he made contact with defendant outside of the Panera Bread store, defendant told Officer Gillespie that "it was all a mistake. He said that he hadn't done anything wrong; * * * he didn't have any knowledge or any kind of association with the people that we may be looking for, but he might be able to point me in the direction of who did." (Tr. 74.) After Jameson confirmed that defendant was the person who sold him the counterfeit tickets, Officer Gillespie arrested defendant.

{¶ 8} Defendant testified in his own defense. He explained that, on the morning of January 13, 2013, he was at his home in Cleveland when he received a call from "three gentlemen from Cleveland saying, Let's go down to the Ohio State game." (Tr. 112.) Defendant asked his wife if he could go, and at first she said no, but then she said okay, and gave defendant "ten $100 bills, $1,000." (Tr. 112-13.) Defendant told her that he was "going to watch the game," but she said, "[y]ou know you are going to sell tickets." (Tr. 113.) Defendant regularly scalped tickets at OSU games, as well as other sporting events, but he told his wife that he was not going to sell tickets that day, as he was going to watch the game. Defendant's friend, Clint Crenshaw, and two other gentlemen picked defendant up, and the men traveled to Columbus together.

{¶ 9} When defendant arrived in Columbus, tickets to the basketball game had sold out. So, defendant went down to the street to try to buy a ticket off of someone. Defendant said he stood on the corner next to a man named David he knew from Cincinnati. Defendant explained that, he was standing "on the corner trying to find a couple tickets, and another gentleman came over and stood in between" him and David.

(Tr. 113.) Defendant knew this other man, "because [he had] seen him hustling down there before." (Tr. 113.)

{¶ 10} Defendant stated that the other gentleman said, "[y]o, yo. * * * Come here for a minute." (Tr. 113.) Defendant walked over and saw Jameson talking to the unidentified man. Defendant had on his sign "that said I need a ticket" on the front, and had a seating chart of the arena on the back. (Tr. 114.) Defendant explained that he allowed Jameson to look at the seating chart, so Jameson could see where the tickets he was considering purchasing from the unidentified man would be located. Defendant explained that "Mr. Jameson looked at [his] chart, seen the man's ticket. That's all he wanted to know. [Defendant] walked away, [and] went back over" to the corner. (Tr. 115.) Defendant explained that he did not "see if [any] transaction went through" between Jameson and the other man. (Tr. 116.)

{¶ 11} Thereafter, defendant and Crenshaw were walking on Lane Avenue together near the Panera Bread store, when the police stopped them. The police asked defendant if he knew Crenshaw, and "initially they both said they didn't know each other," but then later defendant admitted that he did know Crenshaw, as they were both from Cleveland. (Tr. 53.) Defendant denied playing any roll in the transaction with Jameson, besides lending Jameson his seating chart for a moment. Defendant reiterated at trial that he never received $250 from Jameson, never gave Jameson any tickets, and that he "never even touched a ticket that day." (Tr. 119.) After defendant was arrested, he offered to the police that he could "contact the person who had taken the money and to bring [the money] back and give it to Mr. Jameson." (Tr. 98.)

{¶ 12} After trial, the court stated that, "[i]n considering all the evidence, weighing the credibility of the witnesses, I believe the State has proven, Mr. Cargill, your guilt beyond a reasonable doubt." (Tr. 150.) Accordingly, the court found defendant guilty of the crime of theft by deception, imposed a $250 financial sanction, and sentenced defendant to 180 days of incarceration, but suspended 169 of those days and placed defendant under a period of community control for two years. The court also ordered that defendant stay away from OSU property and that defendant pay restitution to Jameson in the amount of $334.

## II. ASSIGNMENTS OF ERROR

{¶ 13} Defendant appeals, assigning the following two assignments of error:

[I] The judgment of the trial court is not supported by sufficient, credible evidence.

[II] The judgment of the trial court is against the manifest weight of the evidence.

{¶ 14} Defendant's assignments of error assert that neither sufficient evidence nor the manifest weight of the evidence support his conviction for theft by deception. For the reasons that follow, we find that the evidence supports defendant's conviction.

{¶ 15} Whether evidence is legally sufficient to sustain a verdict is a question of law. *State v. Thompkins*, 78 Ohio St.3d 380, 386 (1997). Sufficiency is a test of adequacy. *Id.* The evidence is construed in the light most favorable to the prosecution to determine whether a rational trier of fact could have found the essential elements of the offense proven beyond a reasonable doubt. *State v. Jenks*, 61 Ohio St.3d 259 (1991), paragraph two of the syllabus; *State v. Conley*, 10th Dist. No. 93AP-387 (Dec. 16, 1993). When reviewing the sufficiency of the evidence the court does not weigh the credibility of the witnesses. *State v. Yarbrough,* 95 Ohio St.3d 227, 2002-Ohio-2126, ¶ 79.

{¶ 16} Sufficiency of the evidence and manifest weight of the evidence are distinct concepts; they are "quantitatively and qualitatively different." *Thompkins* at 386. When presented with a manifest weight argument, we engage in a limited weighing of evidence to determine whether sufficient competent, credible evidence permits reasonable minds to find guilt beyond a reasonable doubt. *Conley*. *Thompkins* at 387 (noting that "[w]hen a court of appeals reverses a judgment of a trial court on the basis that the verdict is against the weight of the evidence, the appellate court sits as a 'thirteenth juror' and disagrees with the factfinder's resolution of the conflicting testimony"). In the manifest weight analysis the appellate court considers the credibility of the witnesses and determines whether the jury "clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *Id.*, quoting *State v. Martin*, 20 Ohio App.3d 172, 175 (5th Dist.1983). Determinations of credibility and weight of the testimony remain within the province of the trier of fact. *State v. DeHass*, 10 Ohio St.2d 230 (1967), paragraph one of the syllabus. The jury may take note of any

inconsistencies and resolve them accordingly, "believ[ing] all, part or none of a witness's testimony." *State v. Raver,* 10th Dist. No. 02AP-604, 2003-Ohio-958, ¶ 21, citing *State v. Antill,* 176 Ohio St. 61, 67 (1964). In cases involving a bench trial, "the trial court assumes the fact-finding function of the jury." *Cleveland v. Welms,* 169 Ohio App.3d 600, 2006-Ohio-6441, ¶ 16 (8th Dist.).

{¶ 17} The crime of theft by deception provides that "[n]o person, with purpose to deprive the owner of property or services, shall knowingly obtain or exert control over either the property or services in any of the following ways: * * * [b]y deception." R.C. 2913.02(A)(3). *See also State v. Frazier,* 10th Dist. No. 10AP-112, 2010-Ohio-4440, ¶ 28 (noting that, in order to prove theft by deception, the state must show: (1) intent, (2) to deprive the owner, (3) of something of value—i.e., property or services, (4) without the owner's consent, and (5) by deception). "Deception" means knowingly deceiving another or causing another to be deceived by any false or misleading representation, by withholding information, or by any other conduct, act, or omission that creates, confirms, or perpetuates a false impression in another, including a false impression as to law, value, state of mind or other objective or subjective fact. R.C. 2913.01(A). To "deprive" means to "[w]ithold property of another permanently," to "[d]ispose of property so as to make it unlikely that the owner will recover it," or to "[a]ccept, use, or appropriate money, property or services, with purpose not to give proper consideration in return for the money, property or services, and without reasonable justification or excuse for not giving proper consideration." R.C. 2913.01(C)(1) through (3).

{¶ 18} Defendant asserts that there is insufficient evidence to show that he acted knowingly or that he had the specific purpose to deprive Jameson of property. "A person acts knowingly, regardless of his purpose, when he is aware that his conduct will probably cause a certain result or will probably be of a certain nature. A person has knowledge of circumstances when he is aware that such circumstances probably exist." R.C. 2901.22(B). "A person acts purposely when it is his specific intention to cause a certain result, or, when the gist of the offense is a prohibition against conduct of a certain nature, regardless of what the offender intends to accomplish thereby, it is his specific intention to engage in conduct of that nature." R.C. 2901.22(A). Because intent lies within the privacy of a person's own thoughts and is therefore not susceptible to objective proof, intent is

determined from the surrounding facts and circumstances, and persons are presumed to have intended the natural, reasonable, and probable consequences of their voluntary acts. *State v. Garner,* 74 Ohio St.3d 49, 60 (1995).

{¶ 19} The evidence was sufficient to convict defendant of theft by deception. Jameson's testimony established that defendant and another male approached Jameson and asked Jameson if he needed tickets. Jameson stated that he would consider an upgrade, and the men heckled over the price. Jameson stated that he started to walk away from the encounter, but "it was [defendant] who said, Hey, what will you take?" (Tr. 45.) Ultimately, defendant accepted Jameson's offer for $250 cash and his two valid tickets, in exchange for defendant's two tickets for seats purportedly located in Section 105. Jameson "exchanged tickets" with defendant and "paid the cash to [defendant's] partner." (Tr. 15.) Jameson stated that, when he exchanged money and tickets with defendant, he believed he was "getting real tickets as opposed to counterfeit." (Tr. 26.)

{¶ 20} This evidence established that defendant, acting with the purpose to deprive Jameson of his two valid tickets and $250, knowingly exerted control over at least Jameson's valid tickets by perpetuating the false impression that Jameson was receiving two authentic tickets for good seats located in Section 105. Defendant did not sell Jameson two valid tickets for Section 105; rather, he gave him two counterfeit tickets which were worthless. Accordingly, sufficient evidence supports defendant's conviction.

{¶ 21} Defendant's second assignment of error asserts that the manifest weight of the evidence does not support his conviction. Defendant notes that he testified at trial, and denied any involvement in the transaction with Jameson. Defendant further asserts that, because the "counterfeit tickets in question were described as 'good fakes,' whose illegality was not readily apparent," even if defendant had been involved in the sale of the counterfeit tickets, there was no proof that he acted knowingly in deceiving Jameson.

{¶ 22} Reviewing the entire record, the court did not lose its way or create a manifest miscarriage of justice in this action. There is no evidence indicating that defendant believed the tickets for Section 105 were valid tickets. Defendant denied having any part in the transaction to sell Jameson the Section 105 tickets. Defendant

testified that he never even touched a ticket on January 13, 2013. Accordingly, defendant's assertion that he did not act knowingly in deceiving Jameson because he could not have known if the tickets were fake, lacks merit.

{¶ 23} Although, under a manifest weight of the evidence analysis, we are able to consider the credibility of the witnesses, "in conducting our review, we are guided by the presumption that the jury, * * * is best able to view the witnesses and observe their demeanor, gestures and voice inflections, and use these observations in weighing the credibility of the proffered testimony." *State v. Tatum*, 10th Dist. No. 10AP-626, 2011-Ohio-907, ¶ 5, citing *Seasons Coal Co., Inc. v. Cleveland*, 10 Ohio St.3d 77, 80 (1984). The trial court was in the best position to judge the credibility of the witnesses, and the court found Jameson to be a credible witness, as it was entitled to do. Jameson's testimony demonstrated that defendant initiated and completed the ticket transaction with Jameson, and that defendant provided Jameson with two fake tickets in exchange for Jameson's two valid tickets and $250. Accordingly, the manifest weight of the evidence also supports defendant's conviction.

{¶ 24} Based on the foregoing, defendant's first and second assignments of error are overruled.

## III. DISPOSITION

{¶ 25} Having overruled defendant's two assignments of error, we affirm the judgment of the Franklin County Municipal Court.

*Judgment affirmed.*

KLATT and T. BRYANT, JJ., concur.

T. BRYANT, J., retired, of the Third Appellate District, assigned to active duty under authority of the Ohio Constitution, Article IV, Section 6(C).

_____